# NEWMAN *v.* MOYERS.

ATTORNEY AND CLIENT; CONTRACTS; UNITED STATES; CONSTITUTIONAL
LAW.

1. Section 4 of the Act of Congress of March 4, 1915 (38 Stat. at L. 963,
chap. 140), making appropriations to pay war claims, providing
that no part of any item appropriated in excess of 20 per cent
thereof shall be paid to, or received by, any attorney for services
or advancements in connection with the claim, and making it un-
lawful for any attorney to receive any sum which exceeds such
20 per cent, any contract to the contrary notwithstanding, is an
attempted prohibition by implication of the receipt by such an
attorney of any sum for services in excess of the percentage fixed
by the act, irrespective of the service for which it is paid. (Mr.
Chief Justice SMYTH dissenting.)

2. A contract by one having a claim against the Federal government
for private property taken by the United States military authori-
ties during the Civil War, with an attorney to pay him a fee equal
to 50 per cent of the amount which may be collected upon the
claim, and giving the attorney a lien on any warrant that may be
issued in payment of the claim, is valid. (Construing sec. 823,
U. S. Rev. Stat. Comp. Stat. 1916, sec. 1375.)

3. An obligation by the Federal government to pay the former owner
of property taken by the Federal military authorities during the
Civil War is not merely a moral obligation, but constitutes a
valid debt of the United States.

4. While the inhibition of the 14th Amendment of the Federal Constitu-
tion, against the impairment of contracts, is a limitation upon the
legislatures of the states, and not upon Congress, the power of
Congress to impair or modify a contract is confined to those instan-
ces where Congress, out of considerations of public policy, has been
vested with the power to control or regulate the matters to which
the contract relates; and Congress, equally with the States, is
prohibited from depriving a person of his property without due
process of law.

5. Section 4 of the Act of Congress of March 4, 1915 (38 Stat. at L. 963,
chap. 140), in so far as it attempts to invalidate existing and
executed fee contracts between claimants whose claims are appro-
priated for by that act, and their attorneys, by prohibiting such
attorneys from collecting or receiving more than 20 per cent of
the amounts appropriated in payment of the claims, is unconsti-

tutional and void, being discriminatory against such attorneys and also an attempt to deprive them of their property without due process of law, and to modify and destroy pre-existing obligations. (Mr. Chief Justice SMYTH dissenting.)

No. 3021.   Submitted October 4, 1917.   Decided December 3, 1917.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia, sitting as an equity court, denying a motion to dismiss a bill of complaint in a suit to establish a lien upon a fund in the Treasury of the United States, and, the defendants declining to plead, granting the relief prayed for.                                 *Affirmed.*

The COURT in the opinion stated the facts as follows:

Appellees, Ida M. Moyers and Charles F. Consaul, partners, trading as Moyers & Consaul, plaintiffs below, and hereafter referred to as such, filed a bill in equity wherein it was averred that by a written contract dated April 26, 1907, Ursula Ragland Erskine employed plaintiffs as her attorneys at law to prosecute her claim against the United States government for compensation for private property taken from her and her, co-owners by the United States military authorities during the Civil War.   The contract is as follows:

This memorandum of agreement, witnesseth:   That I, Ursula Ragland Erskine, of Huntsville, Alabama, heir of George Orville Ragland and of John D. Ragland, deceased, have employed Moyers & Consaul, of Washington, District of Columbia, and each of them as my attorneys to prosecute my claim against the government of the United States for property taken from me and my co-owners by United States military forces during the Civil War, being pending case No. 12,837 Cong., in the court of claims, and in continuation of said claim, and in consideration of their professional services in the prosecution of said claim, I hereby agree to pay them as a fee a sum equal to fifty per cent (50%) of the amount which may be

collected upon said claim, said fee to be a lien on any warrant that may be issued in payment of said claim.

Witness my hand this 26th day of April, 1907, in the county of Madison, State of Alabama.

(Signed) Ursula Ragland Erskine.

Witness to signature:

A. R. Erskine.

Plaintiffs aver in the bill that they diligently prosecuted the claim to judgment in the court of claims; and after certification of the findings of the court to Congress, where they lay for several years awaiting action, Congress, by Act of March 4, 1915 (38 Stat. at L. 962, chap. 140), appropriated the total sum of $5,510 in satisfaction of the claims of Mrs. Erskine and her two coclaimants, being the amount found due by the court of claims. After the bill was filed, and while the case was awaiting trial, Mrs. Erskine died, and defendant Sue Erskine Newman was duly substituted as administratrix of her estate. Plaintiffs pray that process issue; that defendant Newman be enjoined from receiving from the United States government a warrant for the sum of $1,836.66, being the share of the appropriation belonging to Mrs. Erskine; that defendants McAdoo and Burke be restrained from paying the same; that a receiver be appointed; that McAdoo and Burke be directed to pay said sum of money into the registry of the court to await the further orders of the court; that a rule issue requiring defendants to show cause why injunction should not issue; that a decree be entered to the effect that plaintiffs are entitled to recover from defendant Newman the sum of $918.33 (being 50 per cent of the share of Mrs. Erskine), with costs; and that plaintiffs be decreed to have an equitable lien upon said fund, and for general relief.

Defendants filed a motion to dismiss the bill, which, on hearing, was denied; and, defendants refusing to further plead, a decree was entered requiring that defendants McAdoo and Burke pay the amount into the registry of the court, as prayed; that, upon compliance with the order, they be dismissed without delay; that plaintiffs have and recover from the defendant

Newman the full amount claimed, with costs; that they be paid the same by the clerk of the court out of the money so deposited, and that the balance be paid over to defendant Newman.

All the averments of the bill as to the making of the contract and the performance of the services by plaintiffs are admitted by the motion to dismiss. The sole question reserved by this appeal is the constitutionality of section 4 of the Act of Congress making the appropriation in question, which provides: "That no part of the amount of any item appropriated in this bill in excess of 20 per cent thereof shall be paid or delivered to or received by any agent or agents, attorney or attorneys on account of services rendered or advances made in connection with said claim. It shall be unlawful for any agent or agents, attorney or attorneys to exact, collect, withhold or receive any sum which in the aggregate exceeds 20 per cent of the amount of any item appropriated in this bill on account of services rendered or advances made in connection with said claim, any contract to the contrary notwithstanding. Any person violating the provisions of this act shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined in any sum not exceeding $1,000." It will be observed that this act expressly prohibits the receipt by attorneys of any amount greater than 20 per cent of the sum appropriated, whether payment be made from such or any other fund, and therefore it impliedly prohibits the claimant from paying in any manner, for services rendered, a sum greater than that specified in the act.

*Mr. John E. Laskey,* United States Attorney and *Mr. Mabry C. Van Fleet,* Special Assistant, for the appellants:

The power of Congress indirectly to impair the obligation of a contract is definitely determined in the affirmative by the Supreme Court of the United States in the *Legal Tender Cases,* 12 Wall. 457, and *Legal Tender Case,* 110 U. S. 421; the case of *Lane County* v. *Oregon,* 7 Wall. 71; the acts of Congress making United States notes a legal tender for debts have no reference to taxes imposed by State authority; *Bronson* v. *Rodes,* 7 Wall.

229, a bond given in December, 1851, for payment of a certain sum in gold and silver coin, lawful money of the United States, could not be discharged by a tender of United States notes issued under the Acts of 1862 and 1863; *Butler* v. *Horwitz,* 7 Wall. 258, a contract to pay a certain sum in gold and silver coin is, in substance and legal effect, a contract to deliver a certain weight of gold and silver of a certain fineness to be ascertained by count; and *Trebilcock* v. *Wilson,* 12 Wall. 687, a note is for dollars, payable by its terms *"in specie,"* the sum named must be paid in so many gold or silver dollars of the coinage of the United States.

See also: *Atlantic Coast Line R. Co.* v. *Riverside Mills,* 219 U. S. 186, 202; *Buttfield* v. *Stranahan,* 192 U. S. 470; *Calder* v. *Bull,* 3 Dall. 386; *Central P. R. Co.* v. *Gallalin,* 99 U. S. 700, 744; *Hepburn* v. *Griswold,* 8 Wall. 603, 608, 610, 612, 625; *Legal Tender Cases,* 12 Wall. 457, 549–551, 553; *Legal Tender Case,* 110 U. S. 421, 438; *Louisville & N. R. Co.* v. *Mottley,* 219 U. S. 467, 474, 482, 484, 485; *Mitchell* v. *Clark,* 110 U. S. 633, 641, 643; *Ogden* v. *Saunders,* 12 Wheat. 213; *Ralston* v. *Dunaway,* 184 S. W. 425; *Sinking Fund Cases,* 99 U. S. 700, 744; *Supreme Ruling, F. M. C.* v. *Snyder,* 227 U. S. 497; *United States* v. *Fisher,* 2 Cranch, 358; *Wilkinson* v. *Leland,* 2 Pet. 627.

*Mr. Ida M. Moyers, Mr. Charles F. Consaul, Mr. Jackson H. Ralston,* and *Mr. Joseph W. Bailey* for the appellees, in their brief cited:

*Adair* v. *United States,* 208 U. S. 161; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211; *Allgeyer* v. *Louisiana,* 165 U. S. 578; *A. C. L. R. Co.* v. *Riverside Mills,* 219 U. S. 186; *Ball* v. *Halsell,* 161 U. S. 72; *B. & O. R. Co.* v. *Voigt,* 176 U. S. 498; *Borden* v. *Bradshaw,* 68 Ala. 362; *Boyd* v. *Selma,* 96 Ala. 144, 11 L.R.A. 729; *Bronson* v. *Rodes,* 7 Wall. 229; *Bryan* v. *Kennett,* 113 U. S. 179; *Buck* v. *Miller,* 147 Ind. 586, 37 L.R.A. 384; *Buford* v. *Speed,* 74 Ky. 338; *Buttfield* v. *Stranahan,* 192 U. S. 470; *Carlton* v. *Carlton,* 72 Me. 115; *Carr* v. *State,* 127 Ind. 204; *Clark* v. *Fay,* 205 Mass.

228, 27 L.R.A.(N.S.) 454; *Coffeyville Vitrified Brick & Tile Co.* v. *Perry,* 69 Kan. 297; Constitution, 5th Amendment; Cooley, Const. Lim.; *Corbett* v. *United States,* 1 Ct. Cl. 139; *Cummings* v. *Cummings,* 51 Mo. 261; *Dubuque, etc., R. Co.* v. *Richmond,* 19 Wall. 584; *Emerson* v. *Hall,* 13 Pet. 409; *Engel* v. *State,* 65 Md. 539; *Enzor* v. *Hurt,* 76 Ala. 595; *Erwin* v. *United States,* 97 U. S. 392; *Frisbie* v. *United States,* 157 U. S. 160; *Frorer* v. *People,* 141 Ill. 171, 16 L.R.A. 492, 142 Ill. 387; *Ex parte Garland,* 4 Wall. 333; *Goldfield Cons. M. Co.* v. *Goldfield Miners' Union,* 159 Fed. 500; *Goodcharles* v. *Wigeman,* 113 Pa. 431; *Gordon* v. *Gwydir,* 34 App. D. C. 508; *Grant* v. *United States,* 1 Ct. Cl. 41; *Green* v. *Edwards,* 31 R. I. 1, 77 Atl. 188; *Haskell* v. *Blair,* 3 Cush. 534; *Houston & T. C. R. Co.* v. *Texas,* 170 U. S. 243; *Kalbfus* v. *Siddons,* 42 App. D. C. 310; *Legal Tender Cases,* 12 Wall. 457; *Lone Wolf* v. *Hitchcock,* 187 U. S. 553; *L. & N. R. Co.* v. *Mottley,* 219 U. S. 467; *McGowan* v. *Parish,* 237 U. S. 285; *Martin & Earle* v. *Maxwell,* 86 S. C. 1, 138 Am. St. Rep. 1012; *Mass., etc., Co.* v. *Gills Creek,* 48 Fed. 145; *Matthews* v. *People,* 202 Ill. 389, 63 L.R.A. 73; *Mitchell* v. *Clark,* 110 U. S. 633; *Mitchell* v. *Harmony,* 13 How. 115; *Moyers* v. *Memphis,* — Tenn. —, 186 S. W. 105; *Moyers* v. *Fahey,* 43 Wash. L. Rep. 691; *New York C. & H. R. R. Co.* v. *Gray,* 239 U. S. 583; *Niles* v. *Mathusa,* 162 N. Y. 546; *Nutt* v. *Knut,* 200 U. S. 12; *Osborn* v. *Nicholson,* 13 Wall. 654; *Pac. Mail Co.* v. *Joliffe,* 2 Wall. 450; *Re Paschal,* 10 Wall. 483; *Phelps* v. *McDonald,* 99 U. S. 298; *Pitts* v. *Curtis,* 4 Ala. 350; *Price* v. *Haeberle,* 25 Mo. App. 201; *Prudential Ins. Co.* v. *Hunn,* 21 Ind. App. 525, 69 Am. St. Rep. 380; *Ralston* v. *Dunaway,* — Ark. —, 184 S. W. 425; *Roberts* v. *Consaul,* 24 App. D. C. 551; *Schooner Zilpha,* 40 Ct. Cl. 200; *Sheldon* v. *Sill,* 8 How. 441; *Sherwood* v. *Sherwood,* 32 Conn. 1; *Sinking Fund Cases,* 99 U. S. 700; *C. P. R. Co.* v. *Gallatin,* 99 U. S. 727; *Soulard* v. *United States,* 4 Pet. 511; *Stanton* v. *Embry,* 93 U. S. 548; *State* v. *Goodwill,* 33 W. Va. 179; *State* v. *Kreutzberg,* 114 Wis. 530; *Steele* v. *Gatlen,* 115 Ga. 929; *Stimson's* Fed. and State Const.; *Strother* v. *Lucas,* 12 Pet. 410; *Taylor* v. *Bemiss,* 110 U. S. 42; Tiedemann, State & Fed. Control of Persons & Property;

*Trebilcock* v. *Wilson,* 12 Wall. 687; *Trimble* v. *Mt. Sterling,* 11 Ky. L. Rep. 727, 12 S. W. 1066; *United States* v. *Fisher,* 2 Cr. 358; *United States* v. *Joint Traffic Asso.* 171 U. S. 505; *United States ex rel. Parish* v. *Macveagh,* 214 U. S. 124; *United States* v. *Russell,* 13 Wall. 623; *Wilkinson* v. *Leland,* 2 Pet. 627; *Williams* v. *Fears,* 179 U. S. 274; *Williams* v. *Heard,* 140 U. S. 529; *Williamson* v. *Harris,* 57 Ala. 40; Willoughby, Const.; *Winfree* v. *Bagley,* 102 N. C. 515, 9 S. E. 198.

Mr. Justice VAN ORSDEL delivered the opinion of the court:

The validity of plaintiffs' contract is not questioned. Indeed, such contracts have the express sanction of law. U. S. Rev. Stat. sec. 823, Comp. Stat. 1916, sec. 1375. Similar contracts have been upheld frequently by the courts. *Wylie* v. *Coxe,* 15 How. 415, 14 L. ed. 753; *Taylor* v. *Bemiss,* 110 U. S. 42, 28 L. ed. 64, 3 Sup. Ct. Rep. 441; *Nutt* v. *Knut,* 200 U. S. 12, 50 L. ed. 348, 26 Sup. Ct. Rep. 216; *McGowan* v. *Parish,* 237 U. S. 285, 59 L. ed. 955, 35 Sup. Ct. Rep. 543; *Roberts* v. *Consaul,* 24 App. D. C. 551. In the latter case this court said: "Persons having claims against the United States that must be collected through proceedings in the court of claims are practically compelled, in the majority of cases, to employ attorneys and contract with them for fees contingent upon success. Such contracts are not unlawful, and may be enforced according to their terms where fair and reasonable. *Taylor* v. *Bemiss,* 110 U. S. 42, 45, 28 L. ed. 64, 65, 3 Sup. Ct. Rep. 441."

The claim of Mrs. Erskine was for the value of property taken by the United States military forces during the Civil War. It therefore constituted a valid, subsisting debt of the government. While it is true that the Sovereign cannot be sued except by its consent, such consent was given in this instance, and a tribunal was designated to which the claimant could resort to have her rights adjudicated. Suit was brought in the court of claims under what is known as the Tucker Act (24 Stat. at L. 505, chap. 359). The case was there prosecuted by plaintiffs pursuant to their contract, and the amount due from the government to claimant was duly found and certi-

tied to Congress for payment by appropriation. It was not, therefore, a mere bounty or gratuity, in respect of the payment of which no obligation whatever is imposed upon the government. Congress, in respect of this claim, as well as of other claims embraced in the War Claims Act of March 4, 1915, was called upon to discharge a debt of the United States,—a duty imposed by the Constitution, which, in express terms, forbids the taking of private property for public use without just compensation.

But does the provision of the War Claims Act under consideration abridge the liberty of contract granted the citizen by the Constitution? The word "contract" does not appear in the 5th Amendment, but the word "liberty" therein used has a much broader meaning than the mere absence of physical duress. "The liberty mentioned in that amendment means not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out to a successful conclusion the purposes above mentioned." *Allgeyer* v. *Louisiana,* 165 U. S. 578, 589, 41 L. ed. 832, 835, 17 Sup. Ct. Rep. 427. To the same effect are the decisions in *Williams* v. *Fears,* 179 U. S. 270, 274, 45 L. ed. 186, 188, 21 Sup. Ct. Rep. 128; *United States* v. *Joint Traffic Asso.* 171 U. S. 505, 572, 43 L. ed. 259, 288, 19 Sup. Ct. Rep. 25; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 44 L. ed. 136, 20 Sup. Ct. Rep. 96.

The terms "liberty" and "property" as used in the Constitution are of similar import. It is difficult to define "liberty of action" without invading the domain of property rights. The right to contract is both a liberty and a property right. Freedom of action involves the right to make and enforce contracts, and included in this right is the right to acquire and dispose of property. The claim of Mrs. Erskine before the passage of

the War Claims Act was property of a character which she
could have disposed of by will. With the approval of the bill
appropriating for its payment the proceeds, were property the
payment of which could be enforced by mandamus. *United
States ex rel. Parish* v. *MacVeagh*, 214 U. S. 124, 53 L. ed.
936, 29 Sup. Ct. Rep. 556. Likewise was the contract plain-
tiffs' property. This is true whether the act be construed, as
we have held, as prohibiting the receipt by plaintiffs, irrespec-
tive of the source from which it is paid, of the portion of the
fee contracted for in excess of 20 per cent of the amount appro-
priated, or merely as depriving them of their lien on the par-
ticular fund, leaving unaffected their right to subject other
property of defendant to the payment of such fee. The pro-
vision of the contract for a lien creates a valid right, and, as
such, is entitled to the same protection as any other legal right
created thereby. It may well be that, in many of these war
claims cases, the claimants have no property other than the
fund recovered; and to deprive counsel of the right to enforce
their contracts for compensation out of those funds would, in
effect, render them valueless. The contract here had been
executed so far as plaintiffs were concerned. As this court said
in *Roberts* v. *Consaul*, 24 App. D. C. 560, where a similar con-
tract was involved: "The services of the attorney, as contracted
for, were performed and the consideration therefor earned when
the judgment was recovered. All that remained for him to do,
if permitted, was to receive the draft for the appropriation made
by Congress for the payment of the judgment." The Supreme
Court went further in *McGowan* v. *Parish*, 237 U. S. 285, 59
L. ed. 955, 35 Sup. Ct. Rep. 543. McGowan had been em-
ployed under a contingent fee contract to prosecute the claim
of Parish. Before completion of the case Parish employed
other counsel and attempted to dispense with McGowan's serv-
ices. The court upheld the right of the executrix of McGowan
to recover on the contract. Such a contract must be property,
for an executor takes nothing by virtue of his appointment
but property belonging to the testator. In *Williams* v. *Heard*,
140 U. S. 529, 35 L. ed. 550, 11 Sup. Ct. Rep. 885, the court,
speaking of the validity of a claim for a portion of the fund

paid by Great Britain to the United States as the result of the settlement of the Alabama claims, said: "The claims in this case differ very materially from a claim for a disability pension, to which they are sought to be likened. They are descendible; are a part of the estate of the original claimants which, in case of their death, would pass to their personal representatives and be distributable as assets; or might have been devised by will; while a claim for a pension is personal, and not susceptible of passing by will, or by operation of law, as personalty."

But it is insisted that the inhibition of the 14th Amendment to the Constitution against the 'impairment of contracts is a limitation upon the legislatures of the States, and not upon Congress. Unquestionably, Congress may indirectly and incidentally impair the obligations of a contract. The power of Congress, however, to impair or modify contracts is confined to those instances where Congress has been vested with the power to control or regulate out of considerations of public policy the matters to which the contract relates. "As a result of the complete power of Congress over foreign commerce, it necessarily follows that no individual has a vested right to trade with foreign nations, which is so broad in character as to limit and restrict the power of Congress to determine what articles of merchandise may be imported into this country and the terms upon which a right to import may be exercised. This being true, it results that a statute which restrains the introduction of particular goods into the United States from considerations of public policy does not violate the due process clause of the Constitution." *Buttfield* v. *Stranahan,* 192 U. S. 470, 48 L. ed. 525, 24 Sup. Ct. Rep. 349.

This brings us to the authorities relied upon by defendants in this case. *Sinking-Fund Cases,* 99 U. S. 700, 727, 25 L. ed. 496, 504, involved the power of Congress to require the railroad companies to create a sinking fund for redemption of their bonds upon which the government had loaned its credit and was liable. The majority opinion of the court upheld the enactment on the ground that Congress had retained the right to alter or amend the charter under which the companies acquired their rights from the Federal government. The court,

however, confined the right of Congress by legislation to inter-
fere with private rights, to cases involving governmental pur-
poses. Defining this power the court said: "The United States
cannot any more than a State interfere with private rights,
except for legitimate governmental purposes. They are not
included within the constitutional prohibition which prevents
States from passing laws impairing the obligation of contracts,
but equally with the States they are prohibited from depriving
persons or corporations of property without due process of law.
* * * That this power has a limit, no one can doubt. All
agree that it cannot be used to take away property already ac-
quired under the operation of the charter. * * * Giving
full effect to the principles which have thus been authoritatively
stated, we think it safe to say that whatever rules Congress
might have prescribed in the original charter for the govern-
ment of the corporation in the administration of its affairs, it
retained the power to establish by amendment. In so doing it
cannot undo what has already been done, and it cannot unmake
contracts that have already been made, but it may provide for
what shall be done in the future, and may direct what prepara-
tion shall be made for the due performance of contracts already
entered into. It might originally have prohibited the borrow-
ing of money on mortgage, or it might have said that no bonded
debt should be created without ample provision by sinking fund
to meet it at maturity. Not having done so at first, it cannot
now by direct legislation vacate mortgages already made under
the powers originally granted, nor release debts already con-
tracted. A prohibition now against contracting debts will not
avoid debts already incurred. An amendment making it un-
lawful to issue bonds payable at a distant day, without at the
same time establishing a fund for their ultimate redemption,
will not invalidate a bond already out. All such legislation
will be confined in its operation to the future." What Con-
gress attempted in the present act is just what the court said
in the *Sinking-Fund Cases* could not be done,—"release debts
already contracted" or "avoid debts already incurred."

The *Legal Tender Cases*, 12 Wall. 457, 20 L. ed. 287, relied
upon by counsel for defendants, involved the power of Congress

to make United States Treasury notes a legal tender in payment of debts between individuals. The decision turned largely upon the power of Congress to coin money and regulate its value, borrow money and emit bills of credit. This being an express constitutional power delegated to Congress, the court will not attempt to define or limit Congress in the means employed to carry out the constitutional object. The court, however, held that the act did not impair contracts; since, when persons enter into contracts, they are presumed to do so with full knowledge of the power of Congress to regulate coinage, and will be presumed to agree for payment in legal money at the date of payment. Speaking of the limitations upon Congress the court said: "We have been asked whether Congress can declare that a contract to deliver a quantity of grain may be satisfied by the tender of a less quantity. Undoubtedly not. But this is a false analogy. There is a wide distinction between a tender of quantities, or of specific articles, and a tender of legal values. * * * It cannot, therefore, be maintained that the legal tender acts impaired the obligation of contracts."

That the Legal Tender Act was not regarded by the Supreme Court as impairing the obligations of contracts is clear from the ruling in *Trebilcock* v. *Wilson,* 12 Wall. 687, 20 L. ed. 460. There the contract, made before the passage of the act, called for the payment of a certain amount "in specie;" and the court held that payment could not be enforced in treasury notes, as could be done where the contract called merely for the payment of a certain sum of money without specifying "specie." It was also held in the earlier case of *Bronson* v. *Rodes,* 7 Wall. 229, 19 L. ed. 141, that, where a contract called for payment "in gold and silver coin, lawful money of the United States," it must be paid in coin.

Counsel for defendants also rely upon the case of *Atlantic Coast Line R. Co.* v. *Riverside Mills,* 219 U. S. 186, 55 L. ed. 167, 31 L.R.A.(N.S.) 7, 31 Sup. Ct. Rep. 164, involving the constitutionality of the Carmack Amendment to the Interstate Commerce Act (34 Stat. at L. 584, 595, chap. 3591, Comp. Stat. 1916, secs. 8563, 8604a, 8604aa), whereby the initial carrier was made liable for loss or damage of goods shipped over

its line and the lines of connecting carriers.  The decision turned upon the constitutional power expressly conferred upon Congress to regulate interstate commerce.  But this act was prospective and prohibited only future contracts; and the contract under consideration, having been made after the enactment of the law, came clearly within its provisions.  Stress was laid upon the expression of the court to the effect "that there is no such thing as absolute freedom of contract."  But the context discloses that the statement was addressed to "contracts which contravene public policy" or which "injuriously affect public interests."  Had the contract there involved been made prior to the passage of the Carmack Amendment, it is safe to assume from the language of the opinion that the conclusion reached by the court would have been different.

This brings us to the specific cases wherein Congress has limited counsel fees.  The limitation as to pension cases is found in the Act of Congress of June 20, 1878 (20 Stat. at L. 243, chap. 367), which provides:  "It shall be unlawful for any attorney, agent or other person to demand or receive for his services in a pension case a greater sum than $10.  No fee contract shall hereafter be filed with the Commissioner of Pensions in any case.  In pending cases in which a fee contract has heretofore been filed, if the pension shall be allowed, the Commissioner of Pensions shall approve the same as to the amount of the fee to be paid at the amount specified in the contract."

Interpreting this act the court, in *Frisbie* v. *United States,* 157 U. S. 160, 39 L. ed. 657, 15 Sup. Ct. Rep. 586, said: "The pension granted by the government is a matter of bounty. 'No pensioner has a vested legal right to his pension.  Pensions are the bounties of the government, which Congress has the right to give, withhold, distribute, or recall, at its discretion. *Walton* v. *Cotton,* 19 How. 355, 15 L. ed. 658.'  *United States* v. *Teller,* 107 U. S. 64, 68, 27 L. ed. 352, 354, 2 Sup. Ct. Rep. 39.  Congress, being at liberty to give or withhold a pension, may prescribe who shall receive it, and determine all the circumstances and conditions under which any application therefor shall be prosecuted.  No man has a legal right to a pension, and

no man has a legal right to interfere in the matter of obtaining pensions for himself or others. The whole control of that matter is within the domain of Congressional power. *United States* v. *Hall*, 98 U. S. 343, 25 L. ed. 180. Having power to legislate on this whole matter, to prescribe the conditions under which parties may assist in procuring pensions, it has the equal power to enforce by penal provisions compliance with its requirements."

In two important particulars are pension cases distinguishable from the one at bar. A pension is a gratuity, while the claim here is a valid debt of the government. The Pension Act, limiting counsel fees, is prospective, and all contracts filed at the date of the act with the Commissioner of Pensions in accordance with section 4786, Rev. Stat. Comp. Stat. 1916. sec. 9115, were preserved, with direction to the Commissioner to give them effect according to their terms; while here existing contracts are stricken down, and an attempt to carry them into effect is made a misdemeanor. The court in the *Frisbie Case* distinguishes a pension claim as not constituting a legal claim or demand against the government. "No man has a legal right to a pension, and no man has a legal right to interfere in the matter of obtaining pensions for himself or others," implying clearly that in a claim for private property taken for public use a claimant would have a legal claim and the untrammeled right to contract with a lawyer to represent him in securing its recovery.

To the same effect is the Act of December 22, 1911 (37 Stat. at L. 47, 49, chap. 6), relating to claims of soldiers for back pay and bounty, which provided that no attorney should demand or receive any fee in connection with any claim "filed after the passage of this act." These, like pensions, are not legal obligations of the government, but mere gratuities; and Congress again limits the exercise of its power to the future, preserving the integrity of existing contracts.

The last class of cases in which limitations of this sort are found is Indian depredation claims. (26 Stat. at L. 851, chap. 538). These claims are not legal demands against the United States. The government provided a tribunal in which persons

who had lost property at the hands of any of the Indian tribes at a time when the Indians were in amity with the United States might present their claims and have them adjudicated. True, the judgments are against the United States, but they are chargeable against the funds of the Indians in the Treasury. But, as in the other bounty or gratuity cases cited, the limitation applied to the future, in that it was part of the act authorizing claimants to present their claims in the court of claims for adjudication. It was part of the act permitting the government to be sued in this class of cases. What effect such a limitation would have had if it had been embraced in the Tucker Act, to apply to all cases prosecuted thereunder, it is unnecessary to decide, since no such provision exists. But that situation is essential before any analogy can be drawn between the present act and the Indian Depredation Act.

This brings us to the case of *Ball* v. *Halsell,* 161 U. S. 72, 40 L. ed. 622, 16 Sup. Ct. Rep. 554, strongly relied upon by defendants. Ball sued Halsell on the following contract:

We, the undersigned parties of the first part, do hereby constitute and appoint Thomas Ball our lawful attorney to receive, and to make, sign, and give all necessary acquittances and receipts for, one half of all money which may be received by him as our attorney at law, for prosecuting claims against the United States government, on account of the depredations of the Commanche and Kiowa Indians on our property of horses, mules, and cattle in the State of Texas. Said one half being the amount agreed by us to pay him of all that he may recover of said government for said depredations.

Given under our hands this 22d day of May, A. D., 1874.

J. G. Halsell.

Ball presented in 1875 a claim of Halsell's to the Department of the Interior, and prosecuted it before the Department, securing a recommendation for the payment of $19,625 to Halsell for the depredations alleged in the contract. No appropriation was ever made to pay the sum awarded. After the passage of the Indian Depredation Act, Ball brought suit in the court of

claims and secured judgment for Halsell in the amount of $17,-720, the court awarding Ball an attorney's fee of $1,500. Hence, Ball sued to recover the balance of one half of the amount for which judgment was awarded.

The Indian Depredations Act must be construed either as taking away the former remedy before the Interior Department or as granting an additional remedy, either of which Congress had power to do. If it took away the former remedy, then Ball's contract fell; if it only created an additional remedy, Ball had the option of pursuing the old remedy, upon which there was no limitation as to the amount of fees that might be charged, or he had the option of accepting the new remedy subject to all the terms which it imposed. He did the latter, and the court held that he was subject to the limitations of the act.

But the discussion, so far, is on the assumption that Ball had, but for the provisions of the act, a valid, enforceable contract. But his contract could not have been enforced if no limitation as to attorneys' fees had been placed in the Depredation Act. The contract amounted to an assignment of one half of the claim, which is especially forbidden by statute. Disposing of the case the court said: "But in the present case, as has been seen, the original agreement was contrary to the express terms of the Act of Congress of 1853. That agreement cannot, as it appears to us, be construed as a promise of the principal to pay to the attorney any sum whatever, except out of money recovered and received by the attorney from the United States. The Act of Congress of 1891 expressly declared void 'all contracts heretofore made for fees and allowances to claimants' attorneys.' This act was passed before the attorney had either recovered or received any money upon the principal's claim against the United States. The act did not recognize either the lawfulness or the amount of the claim, or make any appropriation for its payment. But it provided for its ascertainment and adjudication by judicial proceedings, and for the allowance, by the judgment in those proceedings, of a reasonable compensation to the attorney. The restriction of the compensation of attorneys to the amounts so allowed by the court was one of the terms and conditions upon which the United States consented to be sued."

Thus, it will be observed that Ball had an invalid contract upon which he could not have recovered if there had been no limitation in the Indian Depredation Act. The claim he recovered was not a legal demand against the government. Hence, Congress could place any limitation upon the right of recovery it saw fit. In other words, Halsell's claim was not property until the appropriation was made for its payment, while Mrs. Erskine's claim was property from the date her property was taken by the military forces of the United States. The one was a gratuity, concerning the payment of which no legal duty was imposed upon Congress; the other was a debt of the government which Congress could not legally refuse to pay. Plaintiff's contract was a *chose in action*, and, therefore, property from its date. The act here in question was passed after the fee had been earned and when Congress was preparing to pay the judgment. In this respect it is distinguishable from the *Ball Case*, wherein the court said: "This act was passed before the attorney had either recovered or received any money upon the principal's claim against the United States. The act did not recognize either the lawfulness of the amount of the claim, or make any appropriation for its payment."

The act in question is retroactive, in that, instead of forbidding future contracts, it reaches back and strikes down existing legal contracts between private individuals,—contracts which at the date of the act had been fully executed by the attorneys. It also discriminates against attorneys who happen to represent claimants whose claims were embraced within this particular War Claims Act. Reference to the statutes discloses that war claims acts have been passed in several instances since the enactment of the Tucker Act, as well as acts for the payment of individual claims, yet in no other instance has any attempt been made to limit the amount of attorneys' fees which might be charged. "A statute would not be constitutional * * * which should select particular individuals from a class or locality, and subject them to peculiar rules, or impose upon them special obligations or burdens from which others in the same locality or class are exempt. * * * Everyone has a right to demand that he be governed by general rules; and a special

statute which, without his consent, singles his case out as one to be regulated by a different law from that which is applied to all similar cases, would not be legitimate legislation, but would be such an arbitrary mandate as is not within the province of free governments." Cooley, Const. Lim. 6th ed. 481, 483, quoted with approval in *Mathews* v. *People*, 202 Ill. 389, 63 L.R.A. 73, 95 Am. St. Rep. 241, 67 N. E. 28. Concretely speaking, what was done lawfully by counsel in war claims cases from the enactment of the Tucker Act became a misdemeanor if done by counsel representing claims in the present act.

But more serious than all other defects, the act under consideration is an attempt by Congress to deprive plaintiffs of their property without due process of law. An act of Congress does not constitute due process of law, unless it be to lay and collect taxes, duties, imposts, and excises. The powers of Congress are purely legislative. They are neither administrative nor judicial. This constitutional limitation is a restriction upon both legislative and executive power. Due process of law means the regular course of administration through the courts. The refusal of Congress, in the exercise of vested power, to pay a just debt of the government, or to pay a less amount than is due, is not due process of law. In such a case Congress is without lawful discretion, and any action short of full justice is the exercise of arbitrary power. The government has no more right to repudiate a just debt than has the citizen. It logically follows that any attempt on the part of Congress in the payment of a just debt of the government, ascertained by a regularly appointed judicial tribunal, to limit the creditor in the full enjoyment of the money appropriated, or to exempt the fund in the hands of the creditor from just claims to the payment of which it might be otherwise lawfully subjected, would not be due process of law, but the mere exercise of arbitrary power, unwarranted either in law or principle. Such, we think, was the action in this case. The rights of plaintiffs under their contract had become vested, and nothing is clearer than that Congress is without power by direct legislation to destroy or modify the obligations of a contract between private individuals, except it be by a uniform bankruptcy law, which power Congress expressly derives from

the Constitution. Congress may, in the exercise of vested power, indirectly affect existing contracts; but it has no power, by direct enactment, otherwise than by a bankruptcy law, to change the terms of a private contract whereby either party thereto is released in whole or in part, from his obligations.

When Congress attempted to reduce the fee called for by plaintiffs' contract, it amounted to taking their property, due them under a private valid contract, and handing it over to another. If this is not deprivation of liberty and property without due process of law, it would be difficult to conceive of a case where the inhibition of the Constitution would apply. If this were held to be a valid exercise of vested power by Congress, the liberty and property rights of the citizen would be subject to the legislative will. It is difficult to conceive of a more dangerous or tyrannical system of government than that which would logically spring into existence if the legislative fiat were held to be supreme. "That government can scarcely be deemed to be free, where the rights of property are left solely dependent upon the will of a legislative body, without any restraint. The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least, no court of justice in this country would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles of justice and civil liberty—lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people." *Wilkinson* v. *Leland,* 2 Pet. 627, 657, 7 L. ed. 542, 553.

It follows that the act in question is in conflict with the limitations of the Constitution in the particulars above mentioned, and, therefore, void.

The decree is affirmed, with costs. *Affirmed.*

Mr. Chief Justice SMYTH dissenting:

I regret that I am not able to concur in the judgment of the court: First, because of my very high regard for the opinion of my associates formed in the light of their wide juridical ex-

periences; and, second, because I think the appellees have earned the money which they claim; but I cannot of course permit these considerations to affect the performance of my duty as I see it.

We are asked to declare section 4 of the Act of Congress of March 4, 1915, invalid for want of constitutional power to pass it. The question of Congressional authority, then, is the question at issue. No other question is presented by Secretary Mc-Adoo and Treasurer Burke, and they are the only appellants who appear in this court. Before we proceed to the solution of the problem thus raised, we must ascertain the meaning of the attacked section; and in doing this it is our duty, if it has more than one signification, to give to it such interpretation, if possible, as will sustain its constitutionality. The Supreme Court of the United States has said: "If the section admits of two interpretations, one of which brings it within, and the other presses it beyond, the constitutional authority of Congress, it will become our duty to adopt the former construction; because a presumption never ought to be indulged that Congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the court by language altogether unambiguous." *United States* v. *Coombs,* 12 Pet. 72–75, 9 L. ed. 1004–1006. If possible a construction should be given to the act "that will render it free from constitutional objection." *Marshall* v. *Grimes,* 41 Miss. 27–31, approved in *Grenada County* v. *Borgden (Grenada County* v. *Brown),* 112 U. S. 261–266, 28 L. ed. 704–706, 5 Sup. Ct. Rep. 125. "The elementary rule is that every reasonable construction must be resorted to in order to save a statute from unconstitutionality." *Hooper* v. *California.* 155 U. S. 648–657, 39 L. ed. 297–301, 5 Inters. Com. Rep. 610, 15 Sup. Ct. Rep. 207. "We cannot attribute to the legislature, unless compelled to do so by its plain words, a purpose to pass an act in conflict with an act of Congress on a subject over which Congress is given authority by the Constitution of the United States." *Presser* v. *Illinois,* 116 U. S. 252–269, 29 L. ed. 615–620, 6 Sup. Ct. Rep. 580.

Guided by this rule, and reading section 4 in connection with its cognate section, let us see what the section means. Section 1

of the same act provides that the Secretary of the Treasury is "authorized and directed to pay out of any money in the Treasury not otherwise appropriated, to claimants in this act named the several sums appropriated herein." [38 Stat. at L. 962, chap. 140.] Section 4 says that "no part of the amount of any item appropriated in this bill in excess of 20 per cent thereof shall be paid or delivered to or received by any agent or agents, attorney or attorneys on account of services rendered or advances made in connection with said claim." "Shall be paid" by whom? Manifestly, by the Secretary of the Treasury. He is first directed to pay the money to the claimant named in the act, and then commanded not to pay any part of the appropriation in excess of 20 per cent thereof to "any agent or agents, attorney or attorneys, on account of any services rendered or advances made in connection with said claim." No money can be paid out of the Treasury of the United States except in accordance with an act of Congress, and when Congress says to the Secretary of the Treasury that he shall pay a given sum to a named person and forbids him to pay it to anybody else, it would seem that it was acting within its constitutional power, and that the Secretary of the Treasury was bound to obey. None the less the lower court by its judgment, which a majority of this court affirms, directed the Secretary of the Treasury to pay this money, not to the claimant, but to another person, and then required that person to pay a part of it to the appellees, thus in effect commanding the Secretary of the Treasury to ignore an explicit act of Congress. It is judgment that, in doing so, the court exceeded its authority.

But it may be urged that this is too narrow a basis upon which to place a judgment. I do not think so. But assume for the moment that it is, and that the act should be considered from another angle, namely, that it prohibits the claimant from paying anything in excess of the 20 per cent to the attorneys; that they are forbidden to receive more than 20 per cent, and that any contract purporting to authorize them to receive more is by virtue of the act invalid. So considering it, does the act render the contract unenforceable for all purposes, or merely as to the appropriation made by the act? Here we need again to invoke

the rule of interpretation mentioned above. We think that a correct construction of the act, certainly a permissible one, would be that the prohibition relates to the appropriation only. Congress was dealing with the appropriation, and nothing else. The first sentence of section 4 prohibits any payment out of the appropriation except as therein provided. The second sentence declares it unlawful for any person to withhold or receive any sum out of the appropriation over and above 20 per cent, and makes invalid any contract to the contrary. Clearly then, in my judgment, the prohibition relates to the appropriation, and to nothing else. So far as it is concerned, the contract has no effect; but, as to any other resources which the client may have, there is nothing in the act which prohibits the enforcement of the contract. *Nutt* v. *Knut,* 200 U. S. 12–20, 50 L. ed. 348–352, 26 Sup. Ct. Rep. 216; *Wright* v. *Tebbitts,* 91 U. S. 252, 253, 23 L. ed. 320, 321.

This brings us to the inquiry as to whether or not Congress possessed the power to say upon what conditions it would pay the claim for which the appropriation was made. To answer we are not required, or permitted, to consider the wisdom or the justice of the claim itself or of the condition attached. The power of Congress does not depend upon such things. If it had the power to attach the condition, it was the sole judge of the wisdom or justice of the condition. Congress had the power to pay a part of this claim or to refuse to pay any of it. This cannot be successfully denied. And having that power, it must also have had the other power to say upon what conditions it would pay. The whole includes the part.

Statutory provisions similar to the one under review have been sustained by the courts. In *Davis* v. *Com.* 164 Mass. 241–243, 30 L.R.A. 743, 41 N. E. 292, a case in which Mr. Justice Holmes, now of the Supreme Court of the United States, participated, the court was called upon to consider such a provision. Congress had passed an act to reimburse to the States and territories certain taxes collected under a former statute of the United States, and provided that no part of the money appropriated "shall be paid out  *  *  *  to any attorney or agent under any contract for services not existing or heretofore made between the

representative of any State or territory and any attorney or
agent." The State of Massachusetts employed the plaintiff to
present its claim, and agreed to pay him for his services 2 per
cent of the amount which he should collect. He sued to recover
the contract fee, and thus was raised the effect of the prohibitory
clause just set out. The court, speaking to this point, said: "It
may be conceded that Congress in appropriating money to be
paid out of the Treasury of the United States to the States can
impose upon it any trust which it sees fit, and the States, if they
accept the money, are bound to carry these trusts into effect."
It was further said that, since the clause of the plaintiff's con-
tract providing for compensation was "a subordinate and sepa-
rate part" thereof, it might be "waived or modified without a
cancelation or avoidance of the whole contract." The effect of
the decision, as I read it, is that while plaintiff, by reason of the
Congressional prohibition, could not recover anything from the
fund created by the act of Congress, his contract was not void
*in toto,* but could be enforced against any other fund that might
be available.

*Ball* v. *Halsell,* 161 U. S. 72, 40 L. ed. 622, 16 Sup. Ct. Rep.
554, is a pioneer case upon the subject. The plaintiff was em-
ployed in 1874 to prosecute a claim against the United States
on account of Indian depredations, and was by his contract
authorized "to receive, make, and sign, and give all necessary
acquittances and receipts for one half of all money"collected,
it being stated that the one half thus provided for was "the
amount agreed" upon as his fee for services rendered in prose-
cuting the claim. He presented the claim to the Department of
the Interior, and in 1875 secured from it a recommendation
for the payment of a certain sum. No appropriation was made
by Congress to pay the sum so awarded. On March 6, 1891,
after the passage by Congress of an act (26 Stat. at L. 851,
chap. 538) which authorized the adjudication of such claims
by the court of claims, the plaintiff, acting under his contract,
brought suit in that court to recover the sum awarded by the
Department of the Interior, and secured a judgment for $17,-
720, which provided that out of this sum $1,500 should be paid
to him. He claimed one half of the $17,720, and sued to recover

it. The act of Congress last mentioned declared that "all contracts heretofore made for fees and allowances to claimant's attorneys are hereby declared void." It will be noticed that this act was passed long after the plaintiff had made his contracts, and long after he had secured from the Department of the Interior a recommendation for the payment of the claim. Plaintiff asserted that the provision in question was void because, among other things, it impaired the obligation of a lawful contract, and deprived the plaintiff of his property without due process. The court, in considering this objection, reviewed many decisions on related subjects, and then said: The "provision was a wise, reasonable, and just provision for the protection of suitors; and it was clearly within the constitutional power of Congress." In the case at bar the contract does not provide in terms that the attorney is to be paid out of money recovered from the United States, but the theory of the appellees is that it does so in effect, and for that reason they ask for the relief sought in this suit. Ball's contract was in existence, and he had performed valuable services under it at the time the Congressional act limiting fees was passed. None the less the court held that he could not recover the contract fee out of the fund appropriated. This case cannot be distinguished from the one before us on the ground that the plaintiff had elected to prosecute his client's case in the court of claims, rather than by pursuing some other method, because the record does not show that he had any other effective means of enforcing it, and the doctrine of election does not apply except where such means exist. *Omaha* v. *Redick,* 61 Neb. 163, 85 N. W. 46.

Chief Justice Taney in *Beers v. Arkansas,* 20 How. 527–529, 15 L. ed. 991, 992, said that it was "an established principle of jurisprudence * * * that the Sovereign cannot be sued in its own courts * * * without its consent and permission, * * * and as this permission is altogether voluntary on the part of the Sovereignty it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted." *Re Ayers,* 123 U. S. 443–505, 31 L. ed. 216–229, 8 Sup. Ct. Rep. 164; *Hans* v. *Louisiana,* 134 U. S. 1–17, 33 L. ed. 842–848, 10 Sup.

Ct. Rep. 504. The right to be heard in a court of justice is in quality closely related to the right to have paid a just debt; and if the Sovereignty, speaking through Congress, "may prescribe the terms and conditions upon which it consents to be sued," may it not by a parity of reasoning prescribe the terms and conditions on which it will pay a debt?

The plaintiff, in *Spalding v. Vilas*, 161 U. S. 483–490, 40 L. ed. 780–783, 16 Sup. Ct. Rep. 631, alleged that he was employed in 1871 by a number of postmasters to obtain a review and readjustment of their salaries, and that they authorized him to prosecute any claim which they might have against the government, and "to receive the drafts which might be issued in payment therefor." Several acts of Congress were passed making appropriations for the payments of the claims. The one construed by the court was approved August 4, 1886, and provided that payment of all sums thereby appropriated "shall be payable by warrant * * * and payable to the order of and transmitted to the persons respectively entitled thereto." The court said of this provision: "Whatever may have been the value of any services rendered by the plaintiff for his clients; even if the readjustment of their salaries was wholly due to his efforts 'to procure mandatory legislation by Congress, pressing such legislation by all lawful means in his power,' through many years, it was competent for the legislative branch of the government to provide that any sums ascertained to be due to claimants should be paid directly to them. * * * No one will question the power of Congress to enact legislation that would effect such an object. *Ball* v. *Halsell*, supra. If such legislation worked injury to the plaintiff in that it gave his clients an opportunity to evade, for a time, the payment of what they may have agreed to allow him, it was an injury from which no cause of action could arise. This view is so clear that no argument in its support is necessary." If it was competent for the legislative branch of the government to provide in that case that any sum ascertained to be due to the claimants should be paid directly to them, and that no one will question the power of Congress to enact legislation to that effect, what becomes of the argument here, that Congress did not have the power to

direct that the money appropriated should be paid directly to the claimants, except 20 per cent thereof? And may I not say here as was said there that, if such legislation worked injury to the plaintiffs in that it gave their clients an opportunity to evade for a time the payment of what she has agreed to allow them, it was an injury from which no cause of action could arise.

The supreme court of Arkansas in *Ralston* v. *Dunaway,* 123 Ark. 12, 184 S. W. 425, sustained the constitutionality of section 4, saying: "It is manifest from the contract that the parties realized that the claim could only be paid by an appropriation voluntarily made by the government, and necessarily contracted with reference to such appropriation and the terms thereof."

It is no longer debatable that Congress in the exercise of a conceded power may declare invalid contracts lawful at the time they were made, which in any way impair the free exercise of that power. In illustration of this reference may be had to the Sherman Anti-Trust Statute of 1890, in which contracts in restraint of trade are declared to be illegal; Federal Employers' Liability Act of 1908 making unenforceable contracts providing that acceptance by employees of benefits from relief departments of railroads should not release the railroad company from liability for injuries inflicted; and the Statute of 1906 invalidating contracts providing for compensation different in kind from that mentioned in the public tariff schedules of railroad rates. *Standard Oil Co.* v. *United States,* 221 U. S. 1, 55 L. ed. 619, 34 L.R.A.(N.S.) 834, 31 Sup. Ct. Rep. 502, Ann. Cas. 1912D, 734; *Louisville & N. R. Co.* v. *Mottley,* 219 U. S. 467, 55 L. ed. 297, 34 L.R.A.(N.S.) 671, 31 Sup. Ct. Rep 265; *Philadelphia, B. & W. R. Co.* v. *Schubert,* 224 U. S. 603, 56 L. ed. 911, 32 Sup. Ct. Rep. 589, 1 N. C. C. A. 892. In the *Mottley Case,* Mr. Justice Harlan, speaking for the court, said: "The agreement between the railroad company and the Motleys must necessarily be regarded as having been made subject to the possibility that, at some future time, Congress might so exert its whole constitutional power in regulating interstate commerce as to render that agreement unenforceable or to impair its value. That the exercise of such power may be hampered or restricted to any

extent by contracts previously made between individuals or corporations is inconceivable. The framers of the Constitution never intended any such state of things to exist." Mr. Justice Hughes spoke to the same effect in the *Schubert Case*. Congress has the power to pay the debts of the United States, to adjust claims against it, and to appropriate money out of the Treasury for such purposes as it may think will serve the general welfare. If in the exercise of this power it finds its way impeded by a contract of individuals such as the one at bar, it may brush it aside as ineffectual; otherwise the constitutional authority of Congress could be limited by the act of individuals. Is it possible, to paraphrase the language of Mr. Justice Miller speaking for the Supreme Court of the United States, that by making a contract with their client the appellees could prevent the government from settling with the client on any terms it thought proper? *Kendall* v. *United States*, 7 Wall. 113–117, 19 L. ed. 85, 86. The contracts of the appellees with their client in the case at bar were made subject to this Congressional authority, and must be read as if they provided in terms that they were conditioned upon the power of Congress to make, in the act appropriating money for the claim, such provisions with respect to attorneys' fees as it might think suitable.

Much is said about the justness of the claim presented by appellees' client. Its justice may be conceded, and I add; Congress has made provision for the payment of every penny of the claim. But as I have observed at the outset the justice of the claim has no tendency to advance the argument on behalf of the appellees. Congressional authority is not measured by the quality of the justice which its act embraces, nor have the courts any warrant to inquire into the right or wrong of such an act and declare it valid or void as they may regard its ethical character. In this connection, however, it may be observed that the claims in the *Massachusetts* and *Spalding Cases, supra,* were also just, but that did not make void the prohibitory condition attached by Congress to the act providing for their payment. Back pay for soldiers of the War of the Rebellion was provided for by the Act of 1911 (37 Stat. at L. 47, chap. 6), and there was also a provision limiting the amount which might be paid

to attorneys. A claim for back pay due for service on the battle-field should be as sacred as a claim for property taken. Even if we inquire into the merits of the attorneys' claims for fees in each of the aforementioned cases, it will be discovered that they were as sound as those of the one before us.

Acts of Congress making appropriation for claims are cited in which the integrity of existing contracts is preserved. If these are referred to for the purpose of showing Congress's estimate of its own power in the circumstances, it seems to me they militate against, rather than aid, appellees; for if Congress did not believe that it had the authority to affect pre-existing contracts, why a clause saving them from its acts? The Act of 1853 (10 Stat. at L. 170, chap. 81), the Act of 1878 (20 Stat. at L. 243, chap. 367), and the Act of 1911 (37 Stat. at L. 47, chap. 6) contained conditions like section 4. The former, albeit repeatedly before the Supreme Court of the United States, has always been sustained; and no like provision, there being many of them, has ever been held void by that tribunal.

Believing section 4 of the act under examination to be clearly within the purview of Congressional power, I think the judgment of the lower court should be reversed, with costs, and cause remanded, with directions to dismiss the bill.

A petition for the allowance of an appeal to the Supreme Court of the United States was granted February 25, 1918.