# McGOWAN *v.* PARISH.

## APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 150. Argued January 25, 26, 1915.—Decided April 12, 1915.

The appellate jurisdiction of this court in all cases coming from the Court of Appeals of the District of Columbia, under § 250, Judicial Code, is general, except those coming under the first class specified in § 250 in which the jurisdiction of the trial court is in issue and is the only question certified.

Where, as in this case, the jurisdiction is invoked on a substantial ground, other than that of jurisdiction, it extends to the determination of all questions presented by the record, irrespective of the disposition that may be made of the particular question on which the appeal rests.

Where officers of the Government find that they do not have to invoke the protection of Rev. Stat. § 3477 and are willing to pay the amount of a claim upon the United States, or a portion thereof, into court and so protect the rights of one claiming an interest in the warrant, and all parties consent, and grounds for equity exist, and it is not clear that there is an adequate remedy at law, the court may acquire and exercise equity jurisdiction.

The right of defendant to object to equity jurisdiction on the ground that there is an adequate remedy at law may be waived. Even if the trial court might have dismissed the bill for want of jurisdiction of its own motion, if it did not do so, this court is not called upon to pass upon the question.

A consent decree that the claimed portion of a warrant be deposited in court not only amounts to a clear and express waiver of jurisdictional objections, but renders irrelevant all questions as to whether there was or was not an actual lien on the warrant.

A court of equity should do justice completely and not by halves, and should retain the cause for all purposes even though it be thereby called upon to determine legal rights otherwise beyond its authority. *Camp* v. *Boyd,* 229 U. S. 530, 551.

In this case *held* that attorneys originally employed, under a written contract containing a provision against revocation, to collect a claim against the Government and who had rendered substantial services

in connection therewith, but had been superseded by other attorneys over their objection after their offer to proceed with the case, were entitled to compensation to an amount equal to that provided by the contract.

39 App. D. C. 184, reversed.

THE facts, which involve the respective interests of various parties in a claim against the United States which had been adjudicated after a long litigation in the courts in which appellants had at divers times represented the claimants, are stated in the opinion.

*Mr. Clarence R. Wilson* and *Mr. J. J. Darlington*, with whom *Mr. Nathaniel H. Wilson* was on the brief, for appellants.

*Mr. Leigh Robinson*, with whom *Mr. Holmes Conrad* was on the brief, for appellee.

MR. JUSTICE PITNEY delivered the opinion of the court.

This is an equity suit that was commenced in the Supreme Court of the District of Columbia by Jonas H. McGowan and Elijah V. Brookshire, as complainants, against appellee as Executrix of Joseph W. Parish, deceased, together with the Secretary of the Treasury and the Treasurer of the United States, as defendants, in May, 1909, shortly after the decision by this Court of the case of *Parish* v. *MacVeagh*, 214 U. S. 124, and at a time when, pursuant to that decision, a mandate was about to be issued that would have resulted in paying to appellee, as Executrix, the sum of $181,358.95, the amount found by the Auditor for the War Department to be due to Joseph W. Parish in his lifetime upon his claim against the Government, known as the "ice claim," mentioned in the opinion of this court in the case just referred to. The object of the suit was to establish and enforce a lien upon the fund for services rendered in the prosecution of the claim. That claim had long been before the courts and

Congress (*Parish* v. *United States*, 12 Ct. Claims, 609;
100 U. S. 500; 16 Ct. Claims, 642; Act Feb'y 20, 1886, 24
Stat. 653, ch. 11), when, on August 4, 1900, an agreement
in writing was made between Parish and McGowan
whereby the former employed the latter as his attorney
to prosecute and collect it, agreeing "in consideration
of the professional services rendered and to be rendered
by the party of the second part [McGowan], and others
whom he may employ in the prosecution of said claim,"
that he, Parish, would pay to McGowan a fee equal in
amount to fifteen per centum of whatever might be
awarded or collected. McGowan was thereby given con-
trol of the prosecution of the claim to its final determina-
tion, with power to receive and receipt for any draft or
other evidence of indebtedness that might be issued in
payment of it, and to retain from the proceeds the amount
of the stipulated fee; Parish was to furnish the evidence
required and to execute from time to time and deliver
to McGowan powers of attorney or other papers neces-
sary for the prosecution and collection of the claim and
the payment of the fee; Parish agreed that he would not
assign or otherwise dispose of the claim, and that the
agreement should not be vacated by any revocation of
the authority granted to McGowan, "nor by any services
rendered, or which may be rendered, by others, or by the
party of the first part [Parish], his heirs or legal repre-
sentatives, or by any of them;" and McGowan agreed
to diligently prosecute the claim to the best of his pro-
fessional ability to its final determination.

McGowan was a lawyer engaged in practice in the Dis-
trict of Columbia, and after the contract was made, he
rendered professional services under it, before Congress
and otherwise. In December 1902, McGowan and Parish
being desirous of securing the services of the complain-
ant Elijah V. Brookshire as attorney in coöperation with
McGowan, the latter made an agreement with Brookshire

giving him an undivided one-third interest in the contract of August 4, 1900, the purpose being to give him 5% of whatever amount should be awarded or collected upon the claim. A short time after this, Parish and Brookshire entered into a written agreement between themselves, by which the former agreed that he would pay to the latter an additional 5% of the amount awarded or appropriated, and that Brookshire should have a lien for the amount due him upon the award when made; and Brookshire agreed to render necessary and proper legal services in the prosecution of the claim under the direction of Parish.

Thereafter McGowan and Brookshire coöperated, and unquestionably rendered services of value. Through their instrumentality, Congress was induced to pass the act of February 17, 1903 (c. 559, 32 Stat. 1612), referring the claim to the Secretary of the Treasury for examination and the payment of any balance found due to Parish under the rule of damages laid down by this court in *United States* v. *Behan*, 110 U. S. 338, after deducting payments already made. Thereafter, the Secretary of the Treasury referred it to the Auditor for the War Department, who on August 11, 1903, made a finding that there was a balance of $181,358.95 due to Parish, and notified him through McGowan. The Secretary, however, did not accept this finding, but made further investigation, with the result that on May 31, 1904, having concluded that under the rule in the *Behan Case*, and upon the evidence, no balance was due to Parish, he decided to refuse to pay the amount ascertained by the Auditor, or any sum. Shortly after this, friction and disagreements developed between Parish and the attorneys respecting the next steps to be taken, and they continued until Parish's death, which occurred on December 26, 1904, at his residence in the City of Washington. No active steps were taken, during this period, towards pressing the claim. Parish

left a will, but no estate other than the claim. His daughter, Emily E. Parish, proved the will and qualified as Executrix thereunder, and in the year 1905 she employed other counsel, through whom, in May, 1906, she filed in the Supreme Court of the District of Columbia a petition for a mandamus against the Secretary of the Treasury to require him to issue a draft in her favor for the amount of the award of the Auditor for the War Department. That court dismissed the petition, and the Court of Appeals of the District of Columbia affirmed its action. 30 App. D. C. 45. But this court, in the case first above mentioned, reversed this judgment, and remanded the cause with directions looking to the allowance of the mandamus.

At this point, as already mentioned, McGowan and Brookshire filed the present bill of complaint against the Executrix, joining the Secretary of the Treasury and the Treasurer of the United States as parties defendant. The bill set up the several contracts made between Parish and McGowan, between McGowan and Brookshire, and between Parish and Brookshire, respectively; set forth the services performed by complainants under those contracts, and the results of those services, including the passage of the act of February 17, 1903, the finding of the Auditor for the War Department, ascertaining a balance of $181,358.95 due to Parish, and the adverse decision of the Secretary of the Treasury; the subsequent death of Parish; the probate of his will by Emily E. Parish, his Executrix, and the proceedings taken by her in the courts. It also alleged that during Joseph W. Parish's lifetime complainants had advanced money to him for the benefit of himself and his family in sums aggregating $5,000, relying solely upon his promise to repay the loans out of what might be recovered in respect of the claim; that except for that claim he died insolvent, and was indebted in amounts aggregating about $25,000; that the defendant, Emily E.

Parish, and her brother, Grant Parish, had avowed and declared that complainants should never receive any part of the money realized upon the claim, and that they were both insolvent, and if they should receive into their hands the draft about to be issued by the Secretary of the Treasury they would immediately take it out of the jurisdiction of the court for the purpose of defrauding and defeating complainants of their rightful lien and claim on the fund; and that complainants were severally the equitable owners of one-tenth part of said sum of $181,358.95, and entitled to a lien upon the award and finding in respect of that part. The prayers were, in substance, that each of the complainants should be decreed to be the equitable owner of and entitled to one-tenth part of the amount of the award; that the Executrix, the Secretary of the Treasury, and the Treasurer of the United States should be enjoined from receiving or paying over the amount of the award to the detriment of complainants' interests; that a receiver should be appointed to collect the money from the United States and hold it subject to the order of the court; and for general relief. The bill was filed on May 22, 1909, and on the same day a restraining order was made enjoining the Executrix from receiving, and the officers of the Government from paying, the amount of the award. On June 2, with the consent of the respective solicitors for the complainants and the defendant, Emily E. Parish, Executrix, an interlocutory decree was made, dissolving the restraining order and dismissing the bill of complaint as against the Secretary of the Treasury and the Treasurer of the United States, and also dissolving the restraint as against the Executrix; "provided, however, and it is adjudged that in respect of the sum of forty-one thousand dollars and in respect of any warrant, draft or check that may be issued therefor by the Treasury Department, or any officer thereof, as being a part of the award or finding," etc., the Executrix was thereby directed to make a proper

power of attorney authorizing the Vice President of the American Surety and Trust Company to receive the warrant, draft or check, indorse it in her name as Executrix of Joseph W. Parish, deceased, collect the proceeds, and deposit them with the Trust Company "to the credit of this cause and subject to the further order of this court herein and subject to the determination by this court in this cause whether any amount and, if so, what amount is justly due the complainants, or either of them, for professional services rendered by them or either of them, for and in respect of the matters described in the bill of complaint." This consent decree was complied with, to the extent that the Executrix collected from the Treasury Department for the use of the Estate the amount of the award over and above $41,000, and the latter amount was on June 7, 1909, placed with the Trust Company to the credit of the cause, subject to the order of the court. Jonas H. McGowan died on August 2, 1909, and his Executrix was substituted as a party complainant in his stead. An answer was filed in due course by the Executrix of Joseph W. Parish, proofs were taken, and the cause was brought on to final hearing. The Supreme Court of the District of Columbia made a decree awarding to each of the complainants a sum equal to one-tenth part of the amount of the award, with interest from June 7, 1909. 39 Wash. Law Rep. 586. The Court of Appeals reversed this decree (39 App. D. C. 184), and the present appeal was allowed under § 250, Jud. Code, upon the ground that the construction of Rev. Stat., § 3477, had been drawn in question by the defendant. 228 U. S. 312.

Section 250 allows a review by this court of the final judgments or decrees of the Court of Appeals of the District of Columbia upon writ of error or appeal in six classes of cases. The first is: "Cases in which the jurisdiction of the trial court is in issue; but when any such case is not otherwise reviewable in said Supreme Court, then the

question of jurisdiction alone shall be certified to said Supreme Court for decision." In the remaining five classes of cases the section imposes no similar restriction upon the scope of the review. In this respect the section is analogous to § 238, which regulates direct appeals and writs of error from the district courts of the United States. Under that section it is held that, in cases other than those that raise alone the question of the jurisdiction of the district court, the appellate review by this court is general. *Siler* v. *Louis. & Nash. R. R.*, 213 U. S. 175, 191; *Mich. Cent. R. R.* v. *Vreeland*, 227 U. S. 59, 63; *Singer Sewing Machine Co.* v. *Brickell*, 233 U. S. 304, 312, 316. The same rule obtains in cases coming here from a district court under § 266, Jud. Code, where the jurisdiction of that court is invoked upon constitutional grounds and a direct appeal is allowed. *Ohio Tax Cases*, 232 U. S. 576, 586; *Louis. & Nash. R. R. Co.* v. *Finn*, 235 U. S. 601, 604. A similar rule must be applied to appeals and writs of error taken under § 250, and in the present case our jurisdiction, properly invoked upon a substantial ground specified in the section, other than a question of jurisdiction covered by its first clause, extends to the determination of all questions presented by the record, irrespective of the disposition that may be made of the question respecting Rev. Stat., § 3477, or whether it is found necessary to decide that question at all.

The grounds upon which the Court of Appeals denied relief to complainants are, briefly: That contracts like those set out in the bill, so far at least as they attempt to assign or create a lien upon a claim against the United States, are prohibited by § 3477, and thereby made absolutely void; that although this court, in *Nutt* v. *Knut*, 200 U. S. 12, 21, permitted a similar contract to be employed as evidence of an agreed basis of compensation for an attorney's services in prosecuting a claim, yet that decision was rendered in a case coming from a state court,

·where the complaint did not assert nor did the judgment establish any lien upon the fund claimed from the Government, and under the procedure in the state court the question of jurisdiction in equity to entertain the action did not arise, and perhaps could not have arisen; that the present case differed, because complainants sued upon the contracts as a whole, claiming the fees as fixed thereby, and also claiming a lien, and that "had there been an amendment abandoning the lien and relying on the *quantum meruit* solely, the equity court would have been without jurisdiction;" that aside from the contracts there was no attorney's lien upon which to found jurisdiction in equity, because complainants did not themselves reduce the fund to possession, the Executrix having employed other counsel to do this, as she had a right to do, although not thereby entitled to defeat complainants' right to compensation for the reasonable value of their services previously performed; that the allegation of the insolvency of the Executrix, and her intention to remove the fund from the jurisdiction, furnished no foundation for a resort to equity, because relief could have been given by the Supreme Court of the District as a probate court, which had authority to require the Executrix to give sufficient bond for the protection of creditors, or else to revoke her letters and thus prevent the collection of the judgment; that the interlocutory decree entered by consent of the parties did not help the position of complainants nor estop defendant from attacking the contracts as illegal and void or alleging the failure of complainants to prosecute the claim to final determination; that the decree and defendant's answer furnished a ground upon which complainants might have amended their bill so as to convert the suit into a claim for compensation upon a *quantum meruit*, but that no such amendment was made, the cause being heard upon the theory that the allegations of the original bill were sufficient for the purpose, and there being no

evidence of the reasonable value of the services of the attorneys aside from the express stipulations of the contracts, as to which it was held that they did not furnish a measure of the reasonable value of services which were not completely performed as the contracts contemplated; and thereupon, examining the evidence with a view to determining whether the attorneys had performed the contracts so far as permitted by the claimant and his Executrix, the court reached the conclusion that they had in effect abandoned the contracts during the lifetime of Joseph W. Parish, and had made no tender of further services to the Executrix after his death, and hence, upon the whole case, were entitled to no compensation.

As to the effect of § 3477, Rev. Stat.,[1] it has been several times declared by this court that the statute was intended solely for the protection of the Government and its officers during the adjustment of claims, and that, after allowance, the protection may be invoked or waived, as they in their judgment deem proper. *Goodman* v. *Niblack*, 102 U. S. 556, 560; *Bailey* v. *United States*, 109 U. S. 432, 439; *Hobbs* v. *McLean*, 117 U. S. 567, 576; *Freedman's Saving*

---

[1] SEC. 3477. All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share thereof, shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. Such transfers, assignments, and powers of attorney, must recite the warrant for payment, and must be acknowledged by the person making them, before an officer having authority to take acknowledgments of deeds, and shall be certified by the officer; and it must appear by the certificate that the officer, at the time of the acknowledgment, read and fully explained the transfer, assignment, or warrant of attorney to the person acknowledging the same.

*Co.* v. *Shepherd,* 127 U. S. 494, 506; *Price* v. *Forrest,* 173
U. S. 410, 423. But see *Nutt* v. *Knut,* 200 U. S. 12, 20.

In this case, the officers of the Government, after the
suit was commenced (the claim having already been
allowed and finally adjudicated), found that they needed
no protection from the statute and were safe in paying into
court to the credit of the cause a sufficient amount to
answer the claims of complainants. The amount being
paid, the court took control of it, and, with the consent of
the other parties, dismissed the Secretary of the Treasury
and the Treasurer of the United States from the cause.
Under these circumstances, and in view of the consent
decree, we are not called upon to consider whether the
present case is within the reasoning of either of the cases
cited, if we decide—as we do—that in view of the con-
tracts, and of the special facts set up in the bill of com-
plaint as above recited, reasonable and sufficient grounds
existed for invoking the equity jurisdiction, that the subject-
matter was within the cognizance of a court of equity, and
that it was by no means clear that an adequate remedy
existed at law. The equity jurisdiction having thus been
properly invoked, the right of defendant to object be-
cause of the alleged existence of a legal remedy could be
waived. *Reynes* v. *Dumont,* 130 U. S. 354, 395; *Kilbourn*
v. *Sunderland,* 130 U. S. 505, 514; *Brown* v. *Lake Superior
Iron Co.,* 134 U. S. 530, 536; *Re Metropolitan Railway
Receivership,* 208 U. S. 90, 110. It is suggested in the
opinion of the Court of Appeals that the trial court in its
discretion might, of its own motion, have dismissed the
bill for want of jurisdiction. This was not done, and hence
we are not called upon to pass upon the question; but we
must not be understood as assenting to the suggestion.

The consent decree not only amounted to a clear and
express waiver of jurisdictional objections, but it rendered
irrelevant, so far as the present parties are concerned, all
questions as to the effect of the contracts in creating a

lien upon the proceeds of the ice claim, the effect of § 3477,
Rev. Stat., as an obstacle to such lien, the right to a lien
independent of the contracts, the right to an injunction
or receivership, and other questions, if any, that simply
relate to the ground or occasion for coming into equity.
These were waived when the court, with the consent of the
parties, took physical control of the $41,000 for the pur-
pose, very clearly expressed in the interlocutory decree,
of holding it for the benefit of the respective parties,
"subject to the further order of this court herein, and
subject to the determination by this court in this cause
whether any amount and, if so, what amount is justly
due the complainants, or either of them, for professional
services rendered by them, or either of them, for and in
respect of the matters described in the bill of complaint."
This language excluded the idea that the determination
of any other question—whether contract lien, attorney's
lien, or what not—might control the ultimate disposition
of the fund. The simple issue that remained was, of course,
of such a nature that it would have been the proper sub-
ject of an action at law, had it not originally been bound up
with questions appropriate for decision by an equitable
tribunal. But "a court of equity ought to do justice
completely, and not by halves;" and a cause once properly
in a court of equity for any purpose will ordinarily be
retained for all purposes, even though the court is thereby
called upon to determine legal rights that otherwise would
not be within the range of its authority, *Camp* v. *Boyd*,
229 U. S. 530, 551–552, and cases cited. After the making
of the consent decree and the deposit of the money in
court, the situation of this case was substantially that of an
interpleader suit after the making of a decree for inter-
pleader and the dismissal of the stakeholder from the
cause, with the issue as between the conflicting claimants
limited by stipulation to the determination of the amount
"justly due" from the one to the other. That question,

of course, was and is to be decided according to the equities of the claimants as between themselves, without regard to legal technicalities. *Whitney* v. *Cowan*, 55 Mississippi, 626, 645, 647.

We also think the ascertainment whether anything, and if so how much, was due to complainants was well within the prayer for general relief, and cannot agree with the Court of Appeals that there was any necessity for amending the bill. Nor could the Executrix, by her answer, raise any issue other than the simple one previously reserved by the consent decree.

The determination of that issue depends chiefly upon the disputed question of fact, whether the attorneys fairly and fully performed their agreements so far as permitted to do so by Joseph W. Parish in his life-time and his Executrix after his death, as the Supreme Court of the District found that they had done; or whether they in effect abandoned performance and refused to complete their duties under the contracts, as the Court of Appeals found that they had done. This in turn depends, for the most part, upon what took place between McGowan and Brookshire and Parish during the summer and autumn of the year 1904; and since two of these were dead at the time of the hearing, and the third (Brookshire) debarred from testifying as to transactions with or declarations by defendant's testator (Dist. Col. Code, § 1064), the evidence bearing upon the question is fragmentary and largely circumstantial. The Court of Appeals laid great stress upon the fact that, so far as appeared, McGowan made no written reply to a certain letter sent to him by Parish in the month of September, while McGowan was on vacation in Canada. It contained the statement: "You will remember before you left Washington for your summer respite, you said substantially that you had done your best to get the Auditor's report in my case paid by the Secretary of the Treasury, and failed, etc., 'that you

turned over to me the case to be managed in the future and do whatever I deemed best, etc.' Sometime next Congress I propose to organize a practical method and resurrect the claim from its unfortunate condition, and I must have unrestricted and unrestrained control"— with other matter intimating but not expressing a desire that McGowan should expressly abandon the case. The letter was rambling, and its purpose not plain. There was nothing in it to require an immediate reply, or to necessitate a reply in writing. McGowan returned to Washington within two weeks after its receipt, and soon afterwards made repeated efforts to obtain a personal interview with Mr. Parish, but without success. It would serve no useful purpose to rehearse the evidence that was introduced to throw light upon the situation and to show the conduct of the parties during this period. We content ourselves with saying that we are unable to concur in the view of the Court of Appeals, and, on the contrary, think that the weight of the evidence shows that up to the time of Mr. Parish's death the attorneys were ready and willing to proceed, 'but that because of his attitude, as well as by reason of doubts naturally arising from the adverse decision of the Secretary of the Treasury, they were embarrassed about deciding upon the proper course to be followed, among several that suggested themselves: mandamus to the Secretary of the Treasury, a re-hearing before him, a reference to the Court of Claims, or a further application to Congress. Their letter of November 19th, stating: "We have done what we could to secure an interview with you concerning the ice claim. You have deliberately avoided us. The time has come when the matter should have attention. If we do not see you on or before Wednesday next we shall proceed as we deem best under the ample authority which we have," was, in view of all the circumstances, a reasonable though emphatic notice to Parish that, under the right conferred upon them by the

contracts and under the power of attorney that they had, they would exercise their own judgment and discretion as to the proper mode of proceeding, unless they could have an interview with him. And Parish's reply, under date November 22, in which, while not disputing their statement that they had sought and he had avoided an interview, he notified them that he would not submit to their proposed action, amounted in effect to a confirmation of what they already had reasonable ground to believe, that he intended to dispense entirely with their services. That they did not proceed without him, as they threatened to do, is easily explainable on the theory that his personal coöperation was practically, although not legally, indispensable.

The evidence further shows that the Executrix had been fully cognizant, during her father's lifetime, of the general situation respecting the ice claim and knew that McGowan and Brookshire were the attorneys in charge of it; she knew Mr. McGowan had advanced considerable sums to her father for his support and hers, and that these advances remained unpaid at his death; the letter of November 19th and a copy of the reply were among her father's papers and came to her knowledge not long after his death; and the circumstances show that she was not willing that McGowan or Brookshire should have anything further to do with the claim, and that they were made aware of this. We think they were not called upon to make an express offer of their services to the Executrix.

Complainants are therefore entitled to compensation; and since the attorneys' services were admittedly of great value, and resulted in securing to Mr. Parish, as this court in effect held in 214 U. S. 124, a complete right to the payment of the money, and since it was his fault and not theirs that the final steps to recover it were not taken by them, no reason is shown why complainants should not receive the entire amount stipulated for in the contracts.

Those instruments may be resorted to as a basis for calculating the compensation of the attorneys, irrespective of any question about their effect as assignments because of § 3477, Rev. Stat. *Nutt* v. *Knut;* 200 U. S. 12, 21. And the first and foundation agreement in terms provides that it shall not be affected by any revocation of the authority granted to Mr. McGowan, nor by any services rendered by others, or by Parish himself.

The decree of the Court of Appeals is reversed, and the cause remanded, with directions to affirm the decree of the Supreme Court of the District of Columbia and direct the latter court to take further proceedings thereon, if necessary, in accordance with the views above expressed.

*Reversed.*