AMERICAN SURETY CO. OF NEW YORK v. AMERICAN MILLS CO.

(District Court, S. D. New York. January 15, 1920.)

No. 16-36.

1. PRINCIPAL AND SURETY ☞57—SURETY BOND PROCURED BY FRAUD.
   A transaction between defendant mill company and a debtor corporation, apparently insolvent, by which the debtor contracted to deliver a quantity of bags to defendant for payment falsely recited as received, and procured complainant surety company to guarantee delivery, whereby, if the bond was enforced defendant would obtain payment of its debt, *held* fraudulent as to the surety company, and the bond subject to cancellation at its suit.

2. EQUITY ☞53(1)—OBJECTION TO JURISDICTION BECAUSE OF ADEQUATE REMEDY AT LAW MAY BE WAIVED.
   Where the subject-matter of a suit is within the cognizance of a federal court of equity, the right to object to the jurisdiction on the ground of adequate remedy at law may be waived.

3. EQUITY ☞53(1)—OBJECTION TO JURISDICTION WAIVED BY COUNTERCLAIM.
   In a suit for cancellation of a surety bond on the ground that it was obtained by fraud, an objection in the answer to the jurisdiction in equity on the ground that complainant had an adequate remedy at law *held* waived by a counterclaim asking recovery on the bond.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the American Surety Company of New York against the American Mills Company. Decree for complainant.

Henry C. Willcox, of New York City (Henry C. Willcox and Allan C. Rowe, both of New York City, of counsel), for plaintiff.

Henry Uttal, of New York City (Hamilton Moses, of Chicago, Ill., and Herbert J. Haas, of Atlanta, Ga., of counsel), for defendant.

ROSE, District Judge. [1] The plaintiff seeks the cancellation of a bond given to the defendant by the Hartenfeld Bag Company as principal, and itself as surety, and an injunction against suits thereon. The three corporations concerned are of New York, Georgia, and Illinois, respectively, and will be herein severally called the "surety," the "Mills," and the "Bag Company."

For seven years, ending in 1918, the former had bought second-hand bags from the latter, sometimes to the amount of $100,000 annually. Frequently, if not usually, payment had preceded delivery. In August, 1918, the Bag Company was behind in its shipments, and some of the bags which it had furnished had been undergrade. At that time the Bag Company was indebted to the Mills in the amount of about $12,000. Nevertheless, when near the end of August the Mills bought more bags, the Bag Company persuaded it to give, for their purchase price, its notes, aggregating something over $9,000. The Bag Company had been in the habit of selling its accounts to the Commercial Credit Company of Baltimore. Notwithstanding that the notes of the Mills had fully paid for the last purchases, the Bag Company sold its bill for them to the Credit Company, and a few days later discounted the promissory notes of the Mills with a Chicago banker. In this way it obtained double payment for bags which it had certainly never shipped, and which it had probably at that time not even bought.

On the 24th of September, through a telegram from the Credit Company telling the Mills that it had bought the Bag Company's account against it, and stating that a formal notice to that effect had been mailed, the Mills got wind of at least part of what had happened. In due course, the letter of the Credit Company came to hand. It asked to be promptly informed if the Mills claimed any payment, credits, notes, etc., against the account. The Mills, surprised, as it must have been, left the communications of the Credit Company unanswered, but within less than an hour after the receipt of the telegram busied itself in another direction.

The president of the Mills wired the president of the Bag Company that he would arrive at the La Salle Hotel in Chicago on the next evening, September 25th, and to meet him there without fail. The Bag Company's official was not on hand that night, but the next day the president of the mills did see him, and for the next three days they were in more or less constant touch with each other, and then, if not before, the president of the Mills learned that his company's notes had been discounted. It was explained to him that what had happened had been due to the mistake of a "bonehead clerk."

It is admitted that the president of the Bag Company said it was

short of money. There is more or less dispute as to the details of what passed between the two men. It is asserted that the president of the Mills asked for money or for security, real estate or other, while he says he did not. He admits that he came to Chicago to get his account settled. What was actually done speaks for itself.

During the war, it not infrequently happened that sellers of goods were forced to ask for advance payments, and some, if not all, of the Surety Companies, got into the habit of guaranteeing deliveries to buyers. On one or two occasions, the surety had done so much for the Bag Company. As a result of whatever passed between the officials of the Mills and of the Bag Company, the latter, on the 27th, entered into a formal contract to sell the Mills $22,100 worth more of bags, and acknowledged the receipt of that sum of money. The contract provided that deliveries under it should be guaranteed by a surety bond.

The president of the Mills admits that, when he came to Chicago, he had no intention of buying bags, and it is further admitted that, prior to the receipt of the surety bond, he wired the Mills nothing was yet accomplished, but to hold any reply to the Credit Company. The Bag Company took the contract to the surety, and on the 28th obtained from it the bond now in controversy, by which the surety guaranteed the deliveries. This bond was at once turned over to the president of the Mills, and on the same day he started back to Atlanta. The statement in the contract that the $22,100 had been paid was untrue. The president of the Mills, on his return to Atlanta, conferred with its counsel, and on October 1st had the Mills draw its check for $22,100 to the order of the Bag Company. The check was certified, and then with it and his legal adviser he returned to Chicago on the 3d of October.

After having agreed with the president of the Bag Company that the latter was indebted to the Mills in the sum of $21,087.20, the latter drew its check for that amount. They then went to the bank of the Bag Company. The $22,100 certified check of the Mills was deposited to the credit of the Bag Company, and the latter's check for $21,087.-20 was certified and handed to the president of the Mills. The difference between the face of the two checks was $1,012.80. It so happened that the only bags received by the Mills under the contract of September 27th were of the value of $1,050. It follows that, if the bond had never been obtained or is now unenforceable, the Mills will be $37.20 better off for what took place between September 27 and October 3, 1918, and that, if the bond be held good, it will have profited to the amount of $21,087.20.

The president of the Mills admits that he understood, when he made the so-called contract of September 27th, that the Bag Company would pay his company all that it then owed it out of the price that the Mills agreed to pay for the bags of the new contract. A further analysis of the facts is unnecessary. The making of the contract was obviously a mere means of inducing the surety to guarantee the existing debt of the Bag Company. The surety would never have executed the bond, had it been told the facts, and it is certain that both the

president of the Bag Company and the president of the Mills knew that it would not.

[2] The fraudulent character of the whole transaction is too obvious for further comment. The bond should be canceled if this court has in this case jurisdiction so to decree. The Mills says it has none. Phœnix Mutual Life Insurance Co. v. Bailey, 13 Wall. 616, 20 L. Ed. 501, and many cases since, hold that, as one who is sued at law, upon a bond or policy, the execution of which by him was procured, as he asserts, by fraud, may there defend on that ground, he has an adequate remedy at law, and has no claim to the interposition of equity. If the Mills had stood on its objection to the jurisdiction of equity, the line of authorities referred to would have been conclusive. It is, however, equally well settled that when, as here, the subject-matter is within the cognizance of a court of equity, the right of a defendant to object on the ground that there is a legal remedy may be waived. McGowan v. Parish, 237 U. S. 295, 35 Sup. Ct. 543, 59 L. Ed. 955. It is waived when the defendant by cross-bill under the old practice, or by counterclaim under the new, asks for affirmative relief. Original Consolidated Mining Co. v. Abbott (C. C.) 167 Fed. 681; 1 Street's Federal Equity Practice, § 92. A similar principle was applied in Texas & Pacific Railway Co. v. Eastin, 214 U. S. 153, 29 Sup. Ct. 564, 53 L. Ed. 946.

[3] In this case, the Mills, while in its answer asserting that the plaintiff had an adequate remedy at law, went on to set up its counterclaim on the bond, and prayed for a decree against the surety for $21,050, being the penalty of the bond, less $1,050, the value of the bags received by the Mills under the guaranteed contract. It said it did not thereby waive its objection to the jurisdiction of equity. In its present view, what it did was not voluntary on its part, but was required by the new equity rules. If it had not made a counterclaim, it says it would have imperiled its right subsequently to recover upon the bond anywhere. Is that so?

If the Mills had rested upon its contention that the chancellor was without jurisdiction, one of three things would have followed: This court might have agreed with it. If so, nothing which took place in a forum into which it was taken against its will, and from which, upon its demand, it was dismissed for want of jurisdiction, could have injuriously affected its right in any other tribunal. The court might have retained jurisdiction, and decided that the surety had not made out a case for cancellation. The judicial decision that the bond was good could not possibly have hurt the Mills in a subsequent prosecution of its suit at law, instituted before the bill in equity was filed. The third possibility was that the court might hold that the bond was invalid and should be canceled. Then, of course, the controversy would be finally decided against the Mills; but that result would not have depended in whole or in part upon whether it had made or had refrained from making a counterclaim.

It follows that the Mills had no reason for asking affirmative relief, except the hope of getting a decree against the surety for the amount due on the bond. Under such circumstances, to make a coun-

terclaim is to accept the jurisdiction of the court of equity. It becomes, therefore, unnecessary to decide whether, in a case in which there are other reasons for setting up a counterclaim, good faith does not require that a defendant, who wishes to stand to the end upon his objection to the equity jurisdiction, should not move to dismiss before answering, as the rules permit him to do, or, if he includes both his motion to dismiss and his counterclaim in his answer, whether he is not bound to make it plain that he does so only because his right to recover in another forum upon his counterclaim may not be prejudiced by his silence.

The Mills did neither of these things. At the hearing it offered evidence in support of its prayer for an affirmative decree against the surety. No attempt to withdraw the counterclaim was made until after the court had emphatically expressed an opinion upon the merits. Its waiver of objection to the jurisdiction was complete. It is argued that this court may not enjoin a prosecution of state court suits. That is doubtless true, but is not here important. The Mills offered the bond in controversy in evidence. It is still in the custody of this court. A decree canceling it is within the jurisdiction of this tribunal, and, when passed, will make the invalidity of the bond res adjudicata as between the parties to this suit.

Upon reasonable notice, a draft decree in accordance with the conclusions herein reached may be submitted.