### NESBIT et al. v. FREDERICK SNARE CORPORATION.

No. 6933.

United States Court of Appeals for the District of Columbia.

Argued Jan. 13, 1938.

Decided March 7, 1938.

Roger O'Donnell, of Washington, D.C., for appellants.

Brice Clagett and Challen B. Ellis, both of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and STEPHENS, and MILLER, Associate Justices.

GRONER, C. J.

Appellee Frederick Snare Corporation entered into a written agreement August 29, 1922, with Clarence W. DeKnight, an attorney then in practice in the city of Washington, providing among other things

---

for the rendition of services by DeKnight to the corporation in prosecuting a claim of the latter against the United States in return for a contingent fee of 10 per centum. DeKnight brought suit in behalf of the corporation in the United States Court of Claims and procured a decision in favor of the corporation for the sum of $16,503.40, but by a subsequent decision, 75 Ct.Cl. 326, rendered June 6, 1932, the court reduced the amount of the award to $5,474.50, which was later paid and is not now in controversy. On June 22, 1932, De-Knight and the corporation, being dissatisfied with the results so far obtained, entered into another written agreement covering proposed further proceedings in the Court of Claims, the Supreme Court of the United States, "and/or elsewhere." The last agreement provided: "that the Attorney [DeKnight] shall receive in full satisfaction for all services rendered or to be rendered in connection with the aforesaid suit and/or claim a sum equal to one-half or 50% of the amount over $5474.-50 that is ultimately recovered or realized (together with such costs and disbursements as may be awarded against the defendant in said suit, the United States of America) * * *." After the making of this agreement DeKnight applied to the Supreme Court for certiorari to the Court of Claims, which was denied. Snare & Triest Co. v. U. S., 299 U.S. 742, 53 S.Ct. 687, 77 L.Ed. 1489. He thereupon advised the corporation that he expected to have introduced a bill in Congress to obtain the relief which had been denied in the courts. The corporation in a letter to DeKnight under date of May 10, 1933, concurring in his recommendation, advised him as follows:

"After all the decisions against you in this case, we naturally cannot feel very hopeful at the outcome of your effort to secure relief from Congress. We assume, however, that any time or expense in connection with your efforts to secure Congressional relief will be on the basis of our last agreement with you dated June 22, 1932. In other words, that there should be a fifty-fifty division of any sums collected by reason of your success in getting Congress to recognize our claim, but that all expenses in connection with this further effort shall be for your account.

"You have had a long hard road in connection with this claim, and I know we both feel the final decision has been very unfair to us, and therefore to you, and is based on legal technicalities rather than on real justice. We want to thank you for all the work you have done in the matter, and will await your further reply before writing to Mr. Clark."

DeKnight did have a bill introduced in Congress which after passage was approved by the President May 26, 1936, and as a result of which the corporation received from the United States in full settlement of its claim the sum of $83,978.05. The corporation immediately paid to DeKnight 10 per, centum of this amount, or $8,397.80, but declined to pay the balance on the sole ground that to do so would be contrary to the provisions of the act of Congress just above referred to and would render it guilty of a misdemeanor. DeKnight (who is now represented by the executors of his estate) brought this suit to recover the sum of $33,591.22 which, together with the $8,-397.80 paid him, would equal 50 per centum of the amount paid the corporation by the United States. The corporation filed a plea setting up the fact that after payment to DeKnight of 10 per centum of the amount received from the United States it thereupon commingled the balance of that fund with its own funds and that any payment now to be made to the plaintiff would be made out of the common fund of which the money received from the United States is a part and that this would be contrary to the provisions of the act of Congress. The act of Congress is as follows, Act May 26, 1936, 49 Stat. 2304:

"An Act for the relief of the Snare and Triest Company, now Frederick Snare Corporation.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the Snare and Triest Company, now Frederick Snare Corporation, the sum of $83,978.05, in full settlement of all claims against the Government of the United States, for damages for delay in carrying out its contract with the Navy Department, Numbered 3762, and agreements supplemental thereto for waterfront improvements, piers, and breakwater, at the submarine base, Key West, Florida, as reported January 13, 1925, by a board of which Rear Admiral H. H. Rousseau, Civil Engineer Corps, United States Navy, was senior member: Provided, That no part

of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or agents, attorney or attorneys, on account of services rendered in connection with said claim. It shall be unlawful for any agent or agents, attorney or attorneys, to exact, collect, withhold, or receive any sum of the amount appropriated in this Act in excess of 10 per centum thereof on account of services rendered in connection with said claim, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000."

The decision in the case turns on the meaning of the statute. DeKnight's executors contend that it merely forbids payment of money which is definitely a part of the money appropriated and paid by Congress. The corporation contends that it forbids payment of any sum to plaintiff in excess of 10 per centum of the amount received by the corporation without regard to whether the payment is the particular money paid by the United States or not.

█ It is not questioned in this case that the contract of employment was in all respects legal and valid. Nor is it questioned that the services to be rendered were in fact rendered or that the corporation was the beneficiary of the services. We, therefore, conclude that the contract created a legal obligation upon the part of the corporation which, if not recognized after the collection of the money and, if not prohibited by the Act of Congress, can be enforced by suit for the benefit of DeKnight's estate. Nutt v. Knut, 200 U.S. 12, 26 S.Ct. 216, 50 L.Ed. 348; McGowan v. Parish, 237 U.S. 285, 35 S.Ct. 543, 59 L.Ed. 955. And this brings us to an interpretation of the language of the act.

There are, so far as we are advised, only two decisions of the Supreme Court which may be said to throw any helpful light upon this question. The first is Capital Trust Co. v. Calhoun, 250 U.S. 208, 39 S.Ct. 486, 488, 63 L.Ed. 942. In that case Calhoun, a lawyer, brought suit against the administrator of Thomas N. Arnold who prior to his death had a claim against the United States. Calhoun and Arnold had entered into a contract in which the former undertook the prosecution of the claim in consideration of a fee equal in amount to 50 per centum of whatever sum of money should be awarded or collected on the claim. There, as here, the attorney had a bill introduced in Congress for its payment; and there, as here, Congress appropriated the money and Arnold's estate received it. And there, as here, the estate declined payment of more than the act of Congress designated, and there suit was brought by Calhoun to impose a lien upon the money in the hands of Arnold's administrator received from the United States government. That case differed from this in that there was no other property belonging to the estate out of which a judgment could be paid. The appropriation to Arnold was contained in the Omnibus Claims Act of March 4, 1915, 38 Stat. 996. The language of the act is as follows: "No part of the amount * * * appropriated in this bill in excess of 20 per centum thereof shall be paid or delivered to or received by any * * * attorney * * * on account of services rendered *or advances made* in connection with said claim." Section 4. And except for the words "or advances made" is identical down to this point with the language of the act we are construing. The act then continued: "It shall be unlawful for any * * * attorney * * * to exact, collect, withhold or receive any sum which in the aggregate exceeds twenty per centum of the amount * * * appropriated in this bill on account of services rendered * * * in connection with said claim, any contract to the contrary notwithstanding."

The Supreme Court in the Calhoun Case, in a paragraph which as the case subsequently turned out, was unnecessary to the decision, said: "If the judgment [the judgment of the lower court] only establishes a claim against the administrator to be satisfied, not out of the moneys received from the United States but from other assets of the estate, a situation is presented which it was said in Nutt v. Knut, 200 U.S. 12, 21, 26 S.Ct. 216, 50 L.Ed. 348, would not encounter legal objection. In other words, the limitation in the act appropriating the money to 20 per cent. as the amount to be paid to an agent or attorney would have no application or be involved.

If we can accept this language as establishing a guide to the interpretation of the act here, the case would present little difficulty, for here as we have shown the suit is against the corporation and DeKnight's executors are not asserting a lien against any money received from the United States or any right to have that sum earmarked

and held apart for the payment of his fee. All that they assert is a legal obligation on the part of the corporation to pay out of its general funds the amount agreed. The congressional prohibition is certainly as clearly stated in the Omnibus Claims Act as in the act we are concerned with, and if it applied in the Omnibus Act only to the money appropriated by Congress, it would certainly go no farther here. But a year later in Calhoun v. Massie, 253 U.S. 170, at page 175, 40 S.Ct. 474, 475, 64 L.Ed. 843, a similar case involving the same congressional language, the Supreme Court changed its view as we read the opinion, and construed the prohibition to forbid the payment of counsel fees in excess of the per centum provided in the act, either out of the specific fund appropriated or any other funds of the claimant. That our interpretation of the language of the opinion is correct is strengthened by the dissenting opinion of Mr. Justice McReynolds at the bottom of page 178 and the top of page 179 of 253 U.S., 40 S.Ct. 474, 477, 64 L.Ed. 843. We, therefore, have no hesitation in concluding that if the provisions of the two acts were identical there could be no recovery in this case, either out of the specific money paid by the United States or any other money of the corporation. But there is a difference in the wording of the two acts, and this brings us to a consideration of the particular language used by Congress in making the appropriation in this case. In this act, as in the Omnibus Act as we have pointed out, the language is that no part of the amount appropriated in excess of 10 (20 per centum in Omnibus Act) per centum shall be paid, delivered, or received by the attorney. The difference occurs in the next sentence. In the present act the sentence is, "It shall be unlawful for any attorney to exact, collect, withhold, or receive any sum of the amount appropriated in this Act in excess of 10 per centum thereof." In the Omnibus Act the sentence is, "It shall be unlawful for any attorney to exact, collect, withhold or receive any sum which in the aggregate exceeds 20 per centum of the amount appropriated in this bill." This language, Mr. Justice Brandeis in the second Calhoun Case, 253 U.S. 170, 40 S.Ct. 474, 64 L.Ed. 843, said, meant that the attorney should not receive any sum which in the aggregate exceeded 20 per centum of the claim and he italicized the word "aggregate"; but in the present act the words "in the aggregate"

are absent. Instead, the words are, "It shall be unlawful * * * to receive any sum of the amount appropriated * * * in excess of 10 per centum thereof." This sentence is grammatically awkward, and the word "sum" is at least ambiguous. Ordinarily one does not speak of a sum of an amount. Appellants insist that any sum means any quantity of money, and that the act prohibits receiving any quantity of money out of the amount appropriated in excess of 10 per centum thereof. This is a permissible construction of the language, but it is not the only one possible. It is just as permissible to argue that it means any quantity of money on, that is to say, based on, the amount appropriated. Presumably the Supreme Court in the first Calhoun Case, 250 U.S. 208, 39 S.Ct. 486, 63 L.Ed. 942, read the words, "20 per centum of the amount," to mean out of the amount; and presumably the Supreme Court in the second Calhoun Case read the same words to mean, "based on the amount." There are clearly two possible meanings of the sentence, "which may best be illustrated by simply transposing the words or phrases." For example, the sentence may be transposed to read, "It shall be unlawful to receive [,] of the amount appropriated [,] any sum in excess of 10 per centum thereof." On the other hand, the sentence may be transposed to read, "It shall be unlawful to receive any sum in excess of 10 per centum [thereof] of the amount appropriated." In the first revised sentence what is unlawful is receiving from the amount appropriated more than 10 per centum thereof. In the second revised sentence what is unlawful is receiving a fee greater than the stipulated per centum, and in this instance the amount appropriated is not the source of payment but is instead only the basis of computation. Thus the ambiguous language of the act can be turned about into two sentences of positive and directly opposite meaning.

■ In this view we are thrown back on an effort to ascertain the congressional intent. It is a matter of which we take judicial notice that in a very large proportion of all similar bills there is invariably a limitation on the amount of fee which an agent or an attorney may receive. The present form, we were told by counsel in the argument, is the standard form which is used more or less mechanically in the case of all bills appropriating money by way of bounty or in settlement of claims

against the government; and it has been stated by the courts in interpreting such a provision that it grows out of the necessity of protecting the citizen seeking the bounty of the government from imposition and extortion and of protecting the government against false, fictitious, or greatly magnified claims worked up by agents who have contracted for, or expect to get, a large share of the claim that may be allowed. United States v. Van Leuven, D.C., 62 F. 52, 56. The first of the reasons has no applicability here, but the last has real significance; and this was particularly true as the result of conditions growing out of the World War, when the government was faced with loss and damage claims of very large amount as to which it was said there was a moral, if not a legal, liability to make reimbursement. Mr. Justice Brandeis in the second Calhoun Case said: "For nearly three-quarters of a century Congress has undertaken to control in some measure the conditions under which claims against the government may be prosecuted. Its purpose has been in part to protect just claimants from extortion or improvident bargains and in part to protect the treasury from frauds and imposition. See United States v. Van Leuven, D.C., 62 F. 52, 56. While recognizing the common need for the services of agents and attorneys in the presentation of such claims and that parties would often be denied the opportunity of securing such services if contingent fees were prohibited, Taylor v. Bemiss, 110 U.S. 42, 45, 3 S.Ct. 441, 28 L.Ed. 64, Congress has manifested its belief that the causes which gave rise to laws against champerty and maintenance are persistent. By the enactment from time to time of laws prohibiting the assignments of claims and placing limitations upon the fees properly chargeable for services Congress has sought both to prevent the stirring up of unjust claims against the government and to reduce the temptation to adopt improper methods of prosecution which contracts for large fees contingent upon success have sometimes been supposed to encourage."

■ Applying this statement and its reasoning to the present case, and having in mind also what we think are the proper inferences to be drawn from the whole opinion in the second Calhoun Case under language similar though not identical, we have reached the conclusion that the congressional policy and purpose is to forestall champertous contracts and to defeat contracts for exorbitant contingent fees and not simply to declare that the government pays claims, but not attorneys' fees. In other words, Congress declares a public policy against high contingent fees on claims which are only collectible by the grace of the government. We think, therefore, that here the congressional purpose may be effectuated by transposing the language of the act to read, "It shall be unlawful to receive, etc., any sum in excess of 10 per centum of the amount appropriated." In that view we are in accord with the judgment below.

Affirmed.