**BANK OF CALIFORNIA, NATIONAL ASS'N, et al., v. COMMISSIONER OF INTERNAL REVENUE.**

No. 10083.

Circuit Court of Appeals, Ninth Circuit.

Jan. 29, 1943.

Joseph D. Brady, of Los Angeles, Cal., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Bernard Chertcoff, and Samuel H. Levy, Sp. Assts. to Atty. Gen., for respondent.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

MATHEWS, Circuit Judge.

Petitioners, executors of the last will of Harriet Emily Barneson, hereafter called decedent, seek reversal of a decision of the Board of Tax Appeals [1] which determined that there was a deficiency of $25,943.69 in respect of estate taxes owing by them as such executors. Reversal is sought on two grounds:

1. That the Board erred in finding that at the time of decedent's death, April 14, 1936, the fair market value of 1,295 shares of the capital stock of Oakburn Company, a California corporation, hereafter called Oakburn, which at that time were owned by decedent, was $232,396.16 ($179.4565 a share).

2. That the Board, in determining the value of decedent's gross estate, included a sum of money ($8,056.71) which was not includible.

First. Oakburn was organized by decedent's husband, John Barneson, in 1921 as a family holding company. It had outstanding at all pertinent times 7,700 shares

---

[1] Now called the Tax Court of the United States.

of stock, all of the same class and all of the par value of $100 each. One-sixth (1,295) of the shares were issued to decedent, one-sixth to her husband, one-sixth to their daughter, and one-sixth to each of their three sons. The sons transferred their shares to the trustee of trusts which they created in 1924, and of which they were the beneficiaries. There was no other transfer. Thus, at the time of decedent's death, she, her husband, their daughter and their sons' trustee held all the shares. Oakburn's assets at the time of decedent's death consisted of accounts receivable, accrued dividends, debentures, notes receivable, cash, real estate and stock of other corporations.[2] The Board found that the fair market value of these assets at the time of decedent's death was as follows:

| Accounts receivable, | $ | 105.00 |
|---|---|---|
| Accrued dividends, | | 275.00 |
| Debentures, | | 3,027.13 |
| Notes receivable, | | 18,001.00 |
| Cash, | | 50,367.80 |
| Real estate, | | 451,107.50 |
| Stock, | | 1,447,608.13 |
| Total | | $1,970,491.56 |

The Board found that, at the time of decedent's death, Oakburn had liabilities of $576,114.07, and that, therefore, its net worth at that time was $1,394,377.49 ($1,970,491.56 less $576,114.07). These findings are not challenged.

■ The Board found that, at the time of decedent's death, Oakburn stock (7,700 shares) had a fair market value equal to Oakburn's net worth ($1,394,377.49), which is to say, a fair market value of $179.4565 a share, and that, therefore, decedent's Oakburn stock (1,295 of 7,700 shares) had at that time a fair market value of $232,396.16. The question is whether the evidence required a finding that the fair market value of Oakburn stock at the time of decedent's death was less than $179.4565 a share. If not, the Board's finding must be accepted as correct. Pedder v. Commissioner, 9 Cir., 60 F.2d 866, 869; Commissioner v. Burdette, 9 Cir., 69 F.2d 410,

411; Kinney's Estate v. Commissioner, 9 Cir., 80 F.2d 568, 572.

With respect to the valuation of property for estate tax purposes, article 13 of Treasury Regulations 80 (1934 edition), in effect at the time of decedent's death, provided:

"(1) General.—The value of all property includible in the gross estate is the fair market value thereof at the time of the decedent's death. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. * * * Such value is to be determined by ascertaining as a basis the fair market value at the time of the decedent's death of each unit of the property. For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. * * *

"(3) Stocks and bonds.—The value at the date of the decedent's death in the case of stocks and bonds * * * is the fair market value per share or bond on the date of death. * * *

"In the case of the stock of a close corporation, the value shall be determined on the basis of the company's net worth, earning power, and dividend-paying capacity, and all other relevant factors bearing upon the value of the stock. * * *"

■ Oakburn was a close corporation. Therefore, in determining the fair market value of Oakburn stock at the time of decedent's death, the Board was required to consider the factors mentioned in article 13—net worth, earning power, dividend-paying capacity and all other relevant factors—in so far as the evidence disclosed them. Petitioners say that the Board considered, and based its valuation on, a single factor, namely, net worth, and disregarded earning power, dividend-paying capacity and other relevant factors. It thus becomes necessary to inquire whether, and to what extent, these factors were disclosed by the evidence.

The evidence[3] showed that Oakburn's gross earnings were $127,838.57 in 1931, $105,376.90 in 1932, $86,003.76 in 1933, $87,172.32 in 1934, $93,304.07 in 1935, and

---

[2] Bankline Oil Company, California Packing Company, Caterpillar Tractor Company, Gillette Safety Razor Company, Kennecott Copper Corporation, Norwalk Company, Pacific Gas & Electric Company, Socony Vacuum Oil Company, Standard Oil Company of California, Standard Oil Company Kansas, Western Pipe & Steel Company and many others.

[3] The evidence consisted of a stipulation of facts, exhibits attached to and made part of the stipulation, and the testimony of three witnesses—two for petitioners, one for respondent.

$176,421.15 in the three months ended March 31, 1936; that its net earnings were $90,634.86 in 1931; that it incurred a net loss of $185,190.11 in 1932; that its net earnings were $4,899.80 in 1933, $51,785.03 in 1934, $34,945.60 in 1935, and $161,936.82 in the three months ended March 31, 1936; and that it paid dividends of $9.25 a share in 1931, $3.25 a share in 1932, $6 a share in 1933, $7 a share in 1934, $8 a share in 1935, and $1 a share in the three months ended March 31, 1936. The Board did not disregard this evidence, but concluded— and, we think was warranted in concluding —that the earnings and dividends mentioned did not furnish a "reliable criterion for the fair valuation of the Oakburn stock." As stated by the Board: "The exhibit in evidence showing Oakburn's earnings * * * discloses that a substantial part of such earnings were derived from various properties sold or otherwise disposed of * * * prior to the basic date [April 14, 1936], and which properties, on the basic date here involved, no longer formed a part of Oakburn's portfolio of investments from which future earnings might be derived. Thus the prior years' average earnings do not establish any satisfactory trend of a definite earning power of Oakburn's investments owned on the basic date. There is no evidence * * * showing the earning power of the particular investments which were owned by Oakburn on the basic date nor the expenses incurred in managing such particular investments. Likewise, and for similar reasons, Oakburn's record of dividend payments out of prior years' earnings does not establish any satisfactory trend of the earning power of Oakburn's shares of stock."

■ There was no evidence that any property owned by Oakburn at the time of decedent's death was owned by it before March 31, 1936. What Oakburn earned or disbursed before March 31, 1936, was, consequently, no indication of its earning power or dividend-paying capacity at the time of decedent's death. The evidence showed that in April, 1936 (the month of decedent's death), Oakburn had gross earnings of $3,775, incurred expenses and losses aggregating $14,484.33, and paid a dividend of $1 a share; but the evidence did not show, nor is it here contended, that April, 1936, was an average or normal month in Oakburn's operations, or that Oakburn's receipts and disbursements in that month were indicative of its earning power or dividend-paying capacity at the time of decedent's death. What that power or capacity was the evidence did not show. Petitioners, on whom the burden of proof rested, cannot complain of the Board's failure to consider valuation factors not disclosed by the evidence.

■ Another factor which petitioners say the Board disregarded was Oakburn's income tax situation. Oakburn's net income, if any, was subject to taxation by the State of California and by the United States.[4] There was, however, no evidence that Oakburn had any taxable net income in 1936 (the year of decedent's death) or any subsequent year. True, the evidence showed that Oakburn's earnings exceeded its disbursements in the first four months of 1936, but it does not follow that the excess was taxable income. The evidence did not show what Oakburn's gross income for the year was, or what deductions it was entitled to, and hence did not show that it had any net income for the year.

■ Whether Oakburn would have taxable income in 1936 or any subsequent year was not known, and could not be known, at the time of decedent's death. The fact that it might have such income was known and was a factor to be considered in determining the fair market value of its stock. We assume that this factor was considered by the Board. There is no basis for assuming, as petitioners do, that it was disregarded. The fact that the Board found that Oakburn stock had a fair market value equal to Oakburn's net worth does not show that it disregarded the tax factor. But for this factor, the Board might well have found that the stock had a fair market value greater than Oakburn's net worth. It is common knowledge that the fair market value of a corporation's stock may be, and often is, greater than the corporation's net worth, despite the fact that its income is taxable.

Another factor which petitioners say the Board disregarded was that Oakburn stock lacked marketability. The evidence showed that none of the stock was ever sold, but it did not show that it could not be sold, or that it was not marketable. Petitioner's

---

[4] Federal income taxes applicable to Oakburn included the surtax imposed by § 351 of the Revenue Act of 1934, 26 U.S. C.A. Int.Rev.Acts, page 757, in effect at the time of decedent's death.

expert witness, C. Melvin McCuen, stated (1) his opinion that the fair market value of the stock at the time of decedent's death was $135.63 a share and, in explanation of that opinion, stated (2) his opinion that the "asset value" of the stock at that time was $169.53 a share [5] and (3) his opinion that, to arrive at fair market value, "20% should be deducted from asset value because of the fact that Oakburn stock lacked marketability." The "fact" referred to was obviously a mere assumption. The witness, so far as the record shows, did not know or claim to know whether the stock was marketable or not.

■ That Oakburn stock did not have as high a degree of marketability as some stocks have is conceded. This was a factor to be considered in determining the fair market value of the stock. We cannot say that it was disregarded. The weight to be given this and other valuation factors was for the Board, not this court, to decide. Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37, 40, 57 S.Ct. 324, 81 L.Ed. 491; Palmer v. Commissioner, 302 U.S. 63, 70, 58 S.Ct. 67, 82 L.Ed. 50. Nor was the Board obliged to accept as sound the opinion of any expert witness on the subject. Helvering v. National Grocery Co., 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346.

We conclude that the evidence did not require a finding that the fair market value of decedent's Oakburn stock at the time of her death was less than $179.4565 a share.

Second. Decedent had at the time of her death a claim for a refund of an alleged overpayment of her income tax for 1925. After her death petitioners prosecuted an action on the claim in a district court of the United States. Petitioners obtained judgment in the action and, in 1939, received in payment of the judgment $9,453.48, itemized as follows: Principal, $5,485.20; interest to the date of decedent's death, $3,071.39; interest accruing after her death, $896.89. Petitioners paid $499.88 for services and expenses of the attorney who represented them in the action. In determining the value of decedent's gross estate, the Board included $8,056.71 ($5,485.20 plus $3,071.39 less $499.88) of the $9,453.48. This, the petitioners say, was error.

Section 302 of the Revenue Act of 1926, as amended by § 404 of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Code § 811, in effect at the time of decedent's death, provided:

"The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside the United States—

"(a) To the extent of the interest therein of the decedent at the time of his death; * * *."

■ Decedent's claim for a refund was property. It was not real property situated outside the United States, but was personal property. Hence the value of the claim at the time of decedent's death was includible in determining the value of her gross estate; and, for the purpose of that determination, the value of the claim was its fair market value at the time of decedent's death. See article 13, supra.

Petitioners contend that, because of § 3477 of the Revised Statutes, 31 U.S.C.A. § 203,[6] the claim was not assignable and hence could not have any fair market value. This contention is rejected for the following reasons:

■ Section 3477 is for the protection of the United States. Goodman v. Niblack, 102 U.S. 556, 560, 26 L.Ed. 229; Bailey v. United States, 109 U.S. 432, 435-440, 3 S.Ct. 272, 27 L.Ed. 988; Hobbs v. McLean, 117 U.S. 567, 576, 6 S.Ct. 870, 29 L.Ed. 940; Freedman's Savings & Trust Co. v. Shepherd, 127 U.S. 494, 505, 506, 8 S.Ct. 1250, 32 L.Ed. 163; Price v. Forrest, 173 U.S. 410, 423, 19 S.Ct. 434, 43 L.Ed.

---

[5] Apparently, what the witness meant was that, in his opinion, Oakburn's net worth per share was $169.53. Rejecting that opinion, the Board found, and petitioners here concede, that Oakburn's net worth per share was $179.4565.

[6] "All transfers and assignments made of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor, and all powers of attorney, orders, or other authorities for receiving payment of any such claim, or of any part or share, thereof [with inapplicable exceptions], shall be absolutely null and void, unless they are freely made and executed in the presence of at least two attesting witnesses, after the allowance of such a claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof. * * *"

749; McGowan v. Parrish, 237 U.S. 285, 294, 35 S.Ct. 543, 59 L.Ed. 955; Martin v. National Surety Co., 300 U.S. 588, 594–598, 57 S.Ct. 531, 81 L.Ed. 822; California Bank v. United States Fidelity & Guaranty Co., 9 Cir., 129 F.2d 751, 752. The United States may waive that protection and, though not required to do so, may recognize and give effect to an assignment prohibited by § 3477. Bailey v. United States, supra; Martin v. National Surety Co., supra; California Bank v. United States Fidelity & Guaranty Co., supra. And, despite the prohibition, such an assignment is valid as between the parties thereto. Martin v. National Surety Co., supra; California Bank v. United States Fidelity & Guaranty Co., supra.

 Even if the claim was not assignable, it still could have a fair market value, within the meaning of article 13, supra. Article 13 was promulgated under, and must be read in connection with, § 302, supra. Neither § 302 nor article 13 made any distinction between assignable property and nonassignable property. The value of nonassignable property, as well as that of assignable property, was includible in determining the value of a decedent's gross estate under § 302. Article 13 provided: "The value of all property includible in the gross estate is the fair market value thereof at the time of decedent's death." (Emphasis supplied). It is idle, therefore, to say that nonassignable property could not have any fair market value.

Article 13 defines the term "fair market value" as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell." In applying this definition, we are required to assume the existence of a willing buyer and a willing seller, regardless of whether they actually existed or not, and to assume that the property could and would change hands, even though such a change could not in fact occur.

We conclude that the Board should have found the fair market value of decedent's claim at the time of her death and should have included that value in determining the value of her gross estate. Instead, the Board included a part ($8,056.71) of the $9,453.48 recovered by petitioners after her death and made no finding whatever as to the value of the claim. This was error.

Petitioners contend that, in determining the value of decedent's net estate, the Board should be required to allow, as deductions from the value of her gross estate, reasonable counsel fees and other expenses incurred by petitioners in this proceeding. The question thus attempted to be raised was not presented to or decided by the Board and hence will not be considered by us. Tricou v. Helvering, 9 Cir., 68 F.2d 280, 286; Kotteman v. Commissioner, 9 Cir., 81 F.2d 621, 623; Botchford v. Commissioner, 9 Cir., 81 F.2d 914, 917; Sunset Scavenger Co. v. Commissioner, 9 Cir., 84 F.2d 453, 455; Edmonds v. Commissioner, 9 Cir., 90 F.2d 14, 17; Schoenfeld v. Commissioner, 9 Cir., 103 F.2d 964, 966.

Decision reversed and case remanded with directions to find the fair market value of decedent's claim at the time of her death, redetermine the value of her gross and net estate, and thereupon enter such decision as may be proper.